# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ORLANDO GONZÁLEZ TOMASINI,

Plaintiff,

v.                                           CIVIL NO.: 17-1552 (MEL)

UNITED STATES POSTAL SERVICE,

Defendant.

## OPINION & ORDER

Mr. Orlando González Tomasini ("Plaintiff") filed an amended complaint against United States Postal Service and its Postmaster General in his official capacity ("Defendant" or "USPS"), on December 17, 2018. ECF No. 28.[1] In his complaint, Plaintiff alleges violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the Rehabilitation Act, 29 U.S.C. § 791 et seq., and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.[2] Plaintiff alleges that his employer, the USPS, subjected him to age and disability discrimination, interfered with his substantive rights under the FMLA, and retaliated against the Plaintiff for protected activity under each of the above Acts. Specifically, Plaintiff claims he was subject to discrimination, harassment creating a hostile work environment, and retaliation in the form of a hostile work environment, unjust discipline, and the fabrication of a

---

[1] At the time the suit was filed, the Postmaster General of the United States was Megan J. Brennan, but Louis Dejoy has since assumed the post. Under Federal Rule of Civil Procedure 25(d), when a suit is commenced against a public officer in their official capacity who then ceases to hold office and is replaced, then "[t]he officer's successor is automatically substituted as a party."

[2] Plaintiff's claims for violations of the Federal Tort Claims Act ("FTCA") and Puerto Rico law claims under 31 L.P.R.A. §§ 5141, 5142 were dismissed by the court when ruling upon Defendant's motion to dismiss. ECF No. 46.

federal criminal case against him.[3] Pending before the court is Defendant's motion for summary judgment. ECF Nos. 151, 152, 153. Plaintiff responded in opposition on October 18, 2021. ECF Nos. 157, 158.

## I.   ADMISSIBILITY IN SUMMARY JUDGMENT

### A.   THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (EEOC) INVESTIGATIVE REPORT (EXHIBIT H)

As a threshold evidentiary matter, Plaintiff challenges Defendant's introduction of the "EEOC Investigative Report" (Exhibit H; ECF No. 152-8) in support of Defendant's motion for summary judgment.[4] Plaintiff contends that because the EEOC Investigative Report was not written by the Plaintiff it is hearsay and, by implication, inadmissible. ECF No. 157 at 5, ¶¶ 22, 23. However, prior administrative findings are admissible in employee discrimination cases pursuant to the public records hearsay exception. See Chandler v. Roudebush, 425 U.S. 840, 863 n. 39 (1976) ("Prior administrative findings made with respect to an employment discrimination

---

[3] Plaintiff also raised age and disability discrimination under Title VII of the Civil Rights Act, asserting he was subject to a hostile work environment, retaliatory harassment, and disparate treatment. ECF No. 28 at 21. However, Title VII does not protect against discrimination based on age or disability. Salamo Martínez v. Celulares Telefónica, Inc., 272 F. Supp. 2d 144, 152 (D.P.R. 2003). The plain language of Title VII makes no mention of age or disability, and refers only to the unlawfulness of discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Likewise, the portion of Title VII which applies to retaliation specifically prohibits retaliation against an employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [Title VII]." Noviello v. City of Boston, 398 F.3d 76, 90 (1st Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)) (emphasis added). Discrimination and retaliation based on age or disability are instead covered by separate statutes, namely, the Age Discrimination in Employment Act ("ADEA") and the Rehabilitation Act. See Smith v. City of Jackson, Miss., 544 U.S. 228, 254 (2005) (O'Connor, J., Kennedy, J., and Thomas, J., concurring) ("Furthermore, as the Congress that adopted both Title VII and the ADEA clearly recognized, the two statutes were intended to address qualitatively different kinds of discrimination."); Rojas v. Principi, 326 F. Supp. 2d 267, 272–73 (D.P.R. 2004) ("Disability discrimination in federal employment is specifically covered by the provisions of The Rehabilitation Act of 1973, 29 U.S.C. § 794 whereas age discrimination claims against the federal government are governed by the special provisions of the ADEA, specifically 29 U.S.C. § 633a."). Therefore, insofar as the Plaintiff asserts claims for age or disability discrimination under Title VII, the court construes those claims as part of Plaintiff's causes of action under ADEA and the Rehabilitation Act. Plaintiff's disability and age discrimination claims under Title VII are dismissed.

[4] Plaintiff specifically objects to the introduction of the EEOC Investigative report in support of Defendant's proposed facts 22 and 23. ECF No. 152 at 5. However, Plaintiff's challenge also implicates Defendant's proposed facts 32, 34, 98, and 99 because these facts also cite to the EEOC Investigative Report. ECF No. 152 at 9–10, 28–29.

claim may, of course, be admitted as evidence at a federal-sector trial de novo.") (citing Fed. R. Evid. 803(8)). Specifically, Federal Rule of Evidence 803(8)(A)(iii) lists "factual findings from a legally authorized investigation . . . ." as an exception to the hearsay rule in civil cases, as long as the opponent of the evidence "does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(iii)–(B). The First Circuit, like other circuits, has left the question of admissibility and trustworthiness of EEOC reports and findings to the discretion of the trial court. Smith v. Mass. Inst. of Tech., 877 F.2d 1106, 1112–13 (1st Cir. 1989) ("Our canvass of the other circuits reveals general agreement that the question of admissibility is one for the discretion of the district court."); Talavera v. Municipality of San Sebastian, 865 F. Supp. 2d 150, 154 (D.P.R. 2011) ("The Smith opinion essentially stands for the proposition that 'the question of admissibility [of EEOC reports] is one for the discretion of the district court.'"); see also Burns v. Johnson, 829 F.3d 1, 8 n. 5 (1st Cir. 2016) (citing Smith, 877 F.2d at 1113).

Plaintiff has made no showing that would indicate a lack of trustworthiness in the EEOC Investigative Report. Indeed, the Plaintiff does not even appear to contest the factual contentions being supported by the report, and instead challenges the report as the source of Defendant's proposed facts without elaboration. Therefore, because the EEOC Investigative Report falls under the public record exception language of Federal Rule of Evidence 803(8)(A)(iii) and because there is no reason to doubt the trustworthiness of the cited portions of the report, the court exercises its discretion to admit the EEOC Investigative Report as evidence in support of Defendant's motion for summary judgment.

**B. Authentication of Documents from the Office of Workers Compensation Programs ("OWCP")**

Plaintiff also challenges the genuineness of certain documents purporting to be from the Office of Workers' Compensation Programs, originating in an online platform labeled "AQS." Exhibit Q; ECF No. 152-17. Plaintiff argues that under Federal Rule of Civil Procedure 56(c)(2) these documents are not properly authenticated and therefore inadmissible.[5] A document submitted for purposes of summary judgment generally must be properly authenticated. G. v. Fay School, 931 F.3d 1, 14 (1st Cir. 2019) (stating that documents that are "unauthenticated" are "inadmissible at the summary judgment stage" (citing Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000)); but see Joseph v. Lincare, Inc., 989 F.3d 147, 156 (1st Cir. 2021).

Authentication is not generally an onerous requirement and authenticating an exhibit such as that which Defendant seeks to introduce would only require an affidavit or deposition testimony from, for example, a custodian of records confirming the reliability of the records. See Rodríguez Vega v. Policlínica la Familia de Toa Alta, Inc., 942 F. Supp. 2d 210, 223 n. 7 (D.P.R. 2013); Setterlund v. Potter, 597 F. Supp. 2d 167, 170–71 (D. Mass. 2008); Joseph, 989 F.3d at 156. However, while the disputed exhibit does appear to contain genuine OWCP information, Defendant has not even attempted to authenticate the disputed exhibit nor responded to Plaintiff's challenge to the exhibit. See Setterlund, 597 F. Supp. 2d at 171 ("Here, plaintiff has not attempted to authenticate *any* of the disputed exhibits. Although many appear to be genuine—for example, plaintiff has submitted copies of documents that are almost certainly relevant records of the USPS or her medical providers—the appearance of authenticity is not enough."). Therefore, although looking genuine, Defendant's Exhibit Q has not been properly

---

[5] Defendant's Exhibit Q is used as evidentiary support for Defendant's proposed facts 35, 36, 37, 38, 43, 44, 47, 49, 51, 52, 54, 55, 61, 62, 63, and 64. ECF No. 152 at 11–18.

authenticated by Defendant and cannot be admitted as evidence for the purposes of summary judgment.

### C. AUTHENTICATION OF PLAINTIFF'S UNSWORN WITNESS STATEMENTS

Turning to Plaintiff's exhibits, Plaintiff cited to several unsworn statements from deposition witnesses, namely the statements of Rolando Franquiz (Exhibit 10; ECF No. 157-10), Marcos Toledo (Exhibit 17; ECF No. 157-17), and Víctor Rivera (Exhibit 21; ECF No. 157-21). Typically, unsworn witness statements that are not made under penalty of perjury are inadmissible for purposes of summary judgment. See e.g. Setterlund, 597 F. Supp. 2d at 172 ("Plaintiff has also submitted at least six exhibits that are in the form of witness statements or letters, generally addressed "to whom it may concern . . . . [P]laintiff has pointed to no case, and the Court has found none, where an unsworn witness statement (as opposed to a deposition or affidavit) was accepted by a court in opposition to a motion for summary judgment."). However, the authenticity of a written statement can be established independently through a deposition when a witness testifies that they authored the statement and discusses its contents. Joseph, 989 F.3d at 156 ("Fed. R. Evid. 901(b)(1) ("testimony by a witness with knowledge that the item is what it purports to be satisfies the requirement of authentication"). Rolando Franquiz, Marcos Toledo, and Víctor Rivera all testified in their depositions that they authored the statements Plaintiff seeks to introduce and each witness testified as to their contents. The statements by Rolando Franquiz , Marcos Toledo, and Víctor Rivera (ECF Nos. 157-10, 157-17, 157-21) are therefore properly authenticated by the deposition testimony of their authors and can be admitted as evidence in ruling on summary judgment.

## II.    UNCONTESTED FACTS[6]

Plaintiff Orlando González Tomasini began working for the U.S. Postal Service as a city carrier in California in 2003. ECF No. 152 at 1, ¶ 1; ECF No. 157 at 1, ¶ 1. In 2005, Plaintiff transferred to a USPS position in Puerto Rico in 2005, and eventually began working at the Bayamón Branch Post Office as a city carrier. ECF No. 152 at 1, ¶ 2; see ECF No. 157 at 2, ¶ 2. A city carrier prepares, sorts, and cases his mail for the route and delivers mail and packages on the street. ECF No. 152 at 1, ¶ 3; ECF No. 157 at 2, ¶ 3.

During the time that Plaintiff worked at the Bayamón Branch Post Office, almost all the letter carriers were over 40 years old. ECF No. 152-15 at 63, ¶¶ 15–25; ¶¶ 1–19. However, most of the letter carriers at the Bayamón Branch were younger than the Plaintiff. ECF No. 157 at 38, ¶ 25; ECF No. 157-7 at 15, ¶¶ 9–25, 16, ¶¶ 1–2. Plaintiff was born in 1961 and would have been 53 years old in January 2015. ECF No. 152-18 at 2.

Plaintiff was never disciplined while working for the USPS in California and was not disciplined while working with the USPS in Puerto Rico from 2005 to May 14, 2015. ECF No. 157 at 29, ¶ 1; ECF No. 157-6 at 2, ¶ 3. Richard Lugo ("Lugo") was the Manager of the Bayamón, Puerto Rico Branch Post Office from 2009 to 2016 and the second line supervisor of Plaintiff between August 2014 and May 15, 2015. ECF No. 152 at 2, ¶ 8; ECF No. 157 at 3, ¶ 8.

---

[6] The following proposed facts from Defendant's "State of Uncontested Material Facts" (ECF No. 152) are not admitted because they are not supported by their record citation: 26, 28, 46, 48, 61, 63, 65, 66, 70, 80, 86, 88, 89. The following of Defendant's proposed facts are deemed admitted despite Plaintiff's denial because either the denial is not supported by the record citation, the denial is not supported by a record citation at all, or because Plaintiff's denial does not contradict the relevant proposed fact: 2, 3, 4, 5, 6, 9, 12, 13, 15, 16, 17, 30, 50, 59, 60, 67, 73, 76, 77, 79, 83, 91, 92, 93, 95. Furthermore, Defendant's proposed facts 22, 23, and 24 are deemed admitted because Plaintiff's denial is either conclusory or only cites to the amended complaint as support for the denial.

    Defendant did not file a reply statement of material facts in response to Plaintiff's additional assertions presented in his "Counterstatement of Material Facts." ECF No. 157. As such, Defendant neither admitted nor denied these additional facts. Nevertheless, the following proposed facts by Plaintiff in his "Counterstatement of Material Facts" are not admitted because they are not supported by the record citation: 2, 8, 51, 62. Furthermore, the following additional proposed facts submitted by the Plaintiff are not admitted because they are based inadmissible hearsay, a legal conclusion, or because they are speculative: 20A, 20B, 21, 27, 35, 57, 64, 73, 74.

Carmello Moyeno ("Moyeno'), Guillermo Dávila ("Dávila"), and Carlos Cabrera ("Cabrera") also held supervisor positions at the Bayamón Branch post office between 2014 and 2017. ECF No. 157 at 40, ¶ 36; ECF No. 157-8 at 19–24.

Before 2013 Plaintiff had not been diagnosed with any permanent medical condition. ECF No. 152 at 7, ¶ 57; ECF No. 157 at 16, ¶ 57. On April 16, 2013 Plaintiff suffered an accident at work.[7] ECF No. 152 at 5, ¶ 39; ECF No. 152-1 at 99, ¶¶ 18–25; 100, ¶¶ 1–9; 104, ¶¶ 1–25; 105, ¶¶ 1–21. At some unspecified time after the accident, Plaintiff delivered a Federal Workers' Compensation form ("CA-17") regarding the accident to Lugo, which was to be sent to the Office of Workers Compensation Programs ("OWCP"). ECF No. 152 at 5, ¶ 39; ECF No. 152-1 at 99, ¶¶ 18–25; 100, ¶¶ 1–9; 104, ¶¶ 1–25; 105, ¶¶ 1–21. For an unspecified period of time thereafter, Plaintiff performed "limited duty" according to the restrictions established by his doctor in the CA-17. ECF No. 152 at 5, ¶ 39; ECF No. 152-1 at 99, ¶¶ 18–25; 100, ¶¶ 1–9; 104, ¶¶ 1–25; 105, ¶¶ 1–21. Plaintiff's limited duties in connection with the April 16, 2013 accident included no overtime. ECF No. 152 at 5, ¶ 40; ECF No. 157 at 12, ¶ 40. In addition to no overtime, Plaintiff's CA-17 limited how much time he could walk, specified that he could not use a satchel, and required that he be given the "panels of the condominiums." ECF No. 157 at 31–32, ¶ 6; ECF No. 157-2 at 38, ¶¶ 2–10. Although it is unclear for how long Plaintiff's limited duties after his April 16, 2013 accident lasted, Plaintiff was again placed on limited duties from September 11, 2013 through November 6, 2013 for "bulging disk C3-C4", "[p]aracentral disprotrusion C5-C6", and "carpal tunnel syndrome." ECF No. 157-28 at 3.[8]

---

[7] The nature of Plaintiff's April 16, 2013 accident is unknown because Plaintiff successfully moved to strike the cited evidence (ECF No. 152-17) describing the nature of the accident because the proffered source was not authenticated. See supra page 4.

[8] Despite these limited duties, the parties agree that "Plaintiff did not ask for a reasonable accommodation after the accident that he reported to USPS and OWCP in 2013." ECF No. 152 at 5, ¶ 41; ECF No. 157 at 12, ¶ 41; ECF No. 157-28 at 4. This is problematic for several reasons. First, admissible record evidence shows that Plaintiff was placed on limited duties three times in 2013, but the parties do not cite to evidence which specifies after which

Beginning in November 2013, and up to and including May 15, 2015, Juan Santos ("Santos") directly supervised Plaintiff at the Bayamón Branch Post Office. ECF No. 152 at 2, ¶ 6; ECF No. 152-4 at 001; ECF No. 157 at 3, ¶ 6; ECF No. 157-4, at 2. After Santos arrived at the Bayamón Post Office, Plaintiff was once again placed on "limited duties and accommodated"; accommodations which included no overtime and no satchel from December 11, 2013, until January 31, 2014 because of "severe back [and] neck pain, left leg numbness, [and] hand pain." ECF No. 158 at 26; ECF No. 157-28 at 4. Again, "from June 9, 2014, until July 21, 2014, Plaintiff was placed on limited duties and accommodated." ECF No. 158 at 26; ECF No. 157-28 at 5. Plaintiff's "limited duties were extended on July 31, 2014, until August 26, 2014" for "severe neck [and] back pain[,] left leg numbness[, and] back pain." ECF No. 158 at 26; ECF No. 157-28 at 6.

In August 2014, Plaintiff was working Route 56, which he had voluntarily requested. ECF No. 152 at 6, ¶ 45; ECF No. 152-1 at 89–90; ECF No. 152-5 at 153–154; ECF No. 152-15 at 40–41, 110. On August 13, 2014, Plaintiff filed an internal 'Report of Hazard, Unsafe Condition or Practice" with the USPS to "inform management that Mr. Santos is creating a hostile environment by the manner he is conducting himself. There's been manny [sic] incidents with Mr. Santos. His approach to every incident is with a very agressive [sic] manner." ECF No. 157–25. On August 19, 2014, Santos told Plaintiff that in order for him to believe that Plaintiff had medical restrictions, Plaintiff had to submit medical evidence. ECF No. 152 at 3, ¶ 22; ECF No. 152-8 at 1; ECF No. 157 at 30, ¶ 5; 37, ¶¶ 22; ECF No. 157-6 at 3–4, ¶ 9; ECF No. 157-9 at

---

"accident" Plaintiff failed to "ask for a reasonable accommodation." Second, it is unclear how the parties define a request for an accommodation. Plaintiff later contends that being placed on limited duties show that plaintiff was "accommodated" for some medical reason despite the parties agreeing that Plaintiff did not ask for an accommodation in 2013. ECF No. 158 at 26; ECF No. 157-28 at 4. Because of the parties' inconsistent use of the term "accommodation" with regard to Plaintiff's limited duties, for the purposes of deciding the summary judgment motion and taking all inferences in favor of the Plaintiff, the court will consider filing a CA-17 for limited duty restrictions as a request for an "accommodation."

50, ¶¶ 7–12; 55, ¶¶ 20–25; 56, ¶¶ 1–10; 60, ¶¶ 9–15; ECF No. 157-10. Plaintiff, however, refused to provide Santos with medical documentation, explaining that he had reached an agreement with Lugo regarding his medical restrictions. ECF No. 157 at 30, ¶ 3; ECF No. 157 at 40, ¶ 34; ECF No. 157-22 at 101, ¶¶ 2–16. Santos replied that Lugo could "stick that arrangement up his ass because he was the one that was there, and he was the one that would decide what was going to be done there." ECF No. 157 at 30, ¶ 3; ECF No. 157 at 40, ¶ 34; ECF No. 157-22 at 101, ¶¶ 2–16. One witness to the August 19, 2014 exchange, Rolando Franquiz, testified that in 27 years of working for USPS, he had never witnessed a supervisor demand medical documentary evidence from an employee except on this one occasion. ECF No. 157 at 37, ¶¶ 23; ECF No. 157-9 at 56, ¶¶ 20–25; 57, ¶¶ 1–6.

On August 22, 2014 and again on October 1, 2014, Plaintiff requested "auxiliary assistance" for his route based on his "medical restrictions", but Santos denied both requests. ECF No. 157 at 30, ¶ 3A–4; ECF No. 157-6 at 2, ¶ 4–5. Whether to grant auxiliary assistance is determined by the volume of work for the particular route on the given day. ECF No. 152 at 8, ¶ 67; ECF No. 152-4 at 012. Plaintiff suffered another undefined accident and filed an associated OWCP claim on November 24, 2014. ECF 152 at 7, ¶ 50; ECF No. 152-1 at 181, ¶¶ 3–25; ECF No. 152-20 at 1; ECF No. 157 at 15, ¶ 50.[9] On December 3, 2014, Lugo wrote a letter to the claims examiner at the Department of Labor and controverted Plaintiff's OWCP claim, writing that Plaintiff was a "repeat offender." ECF 152 at 7, ¶ 50; ECF No. 152-1 at 181, ¶¶ 3–25; ECF No. 152-5 at 151, ¶¶ 1–14; ECF No. 152-20 at 1; ECF No. 157 at 15, ¶ 50.

---

[9] The nature of Plaintiff's November 24, 2014 accident is unknown due to the fact that Plaintiff successfully moved to strike the cited evidence describing the nature of the accident (ECF No. 152-17) because the proffered source was not authenticated. See supra page 4.

On January 8, 2015, Plaintiff called Moyeno at the Bayamón Branch and reported that he had fallen on his route. ECF No. 157 at 43. ¶ 47; ECF No. 157-8 at 71, ¶¶ 8–10; 75, ¶¶ 4–7. Later that day, Plaintiff reported to the post office, where Moyeno saw that Plaintiff had torn pants and a swollen, red knee. ECF No. 157 at 43, ¶¶ 48; ECF No. 157-8 at 75, ¶¶ 8–20. Moyeno gave Plaintiff a Federal Workers' Compensation form CA-17 and an Application of Continuation of Pay form ("CA-1") so that Plaintiff could get medical attention. ECF No. 157 at 43, ¶¶ 48; ECF No. 157-8 at 75, ¶¶ 8–20. Because of this accident, Plaintiff suffered a knee injury wherein Plaintiff's knee was swollen, painful, and the arc of movement was limited from 0 to 70 degrees. ECF No. 157 at 35, ¶ 16; ECF No. 157-15 at 54, ¶¶ 12–15; 55, ¶¶ 2–16. Moyeno completed the CA-1, informed Santos of Plaintiff's accident, and put everything in a blue folder on Lugo's desk. ECF No. 157 at 76, ¶¶ 4–18; 78, ¶¶ 1–3. Plaintiff received medical attention for the injury and delivered to Moyeno an x-ray of the injury to his knee the day after the accident, on January 9, 2014. ECF No. 157 at 44, ¶ 52; 46 at ¶ 65; ECF No. 157-8 at 123, ¶¶ 7–17; 138, ¶¶ 3–8; 140, ¶¶ 1–10. After his January 8, 2015 accident, Plaintiff elected to be placed on leave of absence outside of the Bayamón Branch post office for 45 days. ECF No. 152 at 7, ¶ 58; ECF No. 157 at 17, ¶ 58; ECF No. 157-8 at 79, ¶¶ 4–17.[10]

At some unspecified time afterwards, Lugo created a created a "special procedure" for Plaintiff whereby all disciplinary and injury matters for the Plaintiff had to go through Santos, and such matters could not go through any other supervisor. ECF No. 157 at 42, ¶ 46; 47, ¶ 68;

_____

[10] Again, it is unclear how the parties define "accommodation." Defendant contends that "Plaintiff did not request reasonable accommodation after his January 8, 2015 knee injury." ECF No. 152 at 9, ¶ 77; ECF No. 152-1 at 217. Plaintiff agreed with the above statement with the following qualification: "Plaintiff stated that it was no[t] necessary at that time to request a reasonable accommodation 'because the doctor is putting it right here, that I should continue on limited duties.'" ECF No. 157 at 24, ¶ 77; ECF No. 157-1 at 217, ¶¶ 18-24. A reasonable inference can be made that Plaintiff's limited duties as specified by the doctor refers to his CA-17. Therefore, as discussed above, supra note 8, the court considers Plaintiff's filing of a CA-17 for limited duty restrictions as a request for reasonable accommodation.

ECF No. 157-8 at 68, ¶¶ 22–24; 134, ¶¶ 1–19.[11] According to Moyeno, to require that all such matters for Plaintiff to go through Santos was not "normal" because there were four supervisors at the branch, and one supervisor was not usually "in charge of one employee." ECF No. 157 at 47, ¶ 68; ECF No. 157-8 at 132, ¶¶ 4–13.

While Plaintiff was out of the Bayamón Branch Post Office on his 45-day leave of absence, a route inspection of Plaintiff's route was carried out by a younger carrier on January 29, 2015, but the inspection paperwork was completed with Plaintiff's name. ECF No. 152 at 10, ¶ 87; ECF No. 152-11 at 020; ECF No. 157 at 36, ¶ 19; ECF No. 157-20 at 1. Plaintiff returned to work after his leave of absence on February 27, 2015 and submitted a CA-17 which his doctor had completed the day before. ECF No. 157 at 17, ¶ 59; ECF No. 152-1 at 109–10; ECF No. 152-11 at 38–39, ¶ 107. Plaintiff also demanded a copy of the inspection of his route and noticed that the inspection paperwork had been done in his name although Plaintiff himself had not carried out the inspection. ECF No. 152 at 8; ¶ 59; ECF No. 152-1 at 110, ¶¶ 15–25, 111, ¶ 15–25; ECF No. 157 at 36, ¶ 20; ECF No. 157-2 at 105, ¶¶ 17-25.

On March 12, 2015, Union Shop Steward Marco Toledo ("Toledo"), Plaintiff, Santos, and Lugo had a meeting where Santos said to Plaintiff "with your physical conditions you should go to work to another post office and when [you are] ready to work for real to bid back because at this post office you have to come to work." ECF No. 157 at 49, ¶ 75; ECF No. 157-17 at 1. In the same meeting, Lugo also told the Plaintiff, "[Y]ou're just a cheater like Robert Rosado [a retired letter carrier] who had an accident on every route he was on." ECF No. 157 at 49, ¶ 75; ECF No. 157-17 at 1. Eight days after this meeting, Santos yelled at letter carrier Víctor Rivera

---

[11] Because Moyeno was involved in Plaintiff's January 8, 2015 accident instead of just Santos, a jury could reasonably conclude that this special arrangement was created after January 8, 2015.

to "keep away from [Plaintiff] or he would take 4 hours to case his route." ECF 157 at 38–39, ¶ 28–29; ECF No. 157-21 at 1; ECF No. 157-7 at 47, ¶¶ 11–22.

On April 6, 2015, Plaintiff made initial contact with the EEOC by requesting an appointment with an EEOC dispute resolution specialist. ECF No. 152 at 2, ¶ 9; ECF No. 152-6 at 1; ECF No. 157 at 3, ¶ 9; ECF No. 157-5 at 1. Subsequently, Plaintiff participated in another meeting with Lugo, Santos, and Toledo, during which Lugo referred to Plaintiff as a "repeat offender," Santos referred to him as a "hustler," and Plaintiff was told the nickname that Lugo and Santos had for him: "Trucoman56." ECF No. 157 at 32, ¶ 10; ECF No. 157-2 at 54, ¶¶ 13–22.

On April 13, 2015, Plaintiff drove a postal vehicle to deliver the mail on his assigned route with an expired license. ECF No. 152 at 11, ¶ 91; ECF No. 152-21 at 00116. The next day, on April 14, 2015, Santos asked to see Plaintiff's driver's license which had expired on April 11, 2015, and Santos therefore suspended Plaintiff's driving privileges. ECF No. 152 at 11, ¶ 92; ¶ 93; ECF No. 152-21 at 00116; ECF No. 157 at 27, ¶ 93. That same day, April, 14, 2015, USPS employee Melvin Rivera Nieves heard Santos give Plaintiff bids for routes telling him that Plaintiff "might read them out and you might find something that you can do in some other station. And if you get any better, you can bid back to Bayamón Branch when you are fit for duty." ECF No. 157 at 48, ¶ 71; ECF No. 157-19; ECF No. 157-23 at 21, ¶¶ 2–6; 22, ¶¶ 2–10.

On April 14, 2015 and April 15, 2015, Plaintiff was absent from work, either partially or totally, and Santos placed him on Leave Without Pay ("LWOP") pursuant to the Postal Labor Relations Manual. ECF No. 152 at 11, ¶ 95; ECF No. 152-23 at 001, 003–004. On April 16, 2015 Plaintiff was marked absent without leave ("AWOL") for his failure to report his absence through the automated phone system or to contact his supervisor to notify his absence. ECF No.

12

152 at 11, ¶ 95; ECF No. 152-23 at 001. On April 17, 2015, Plaintiff filed an "Information for Pre-Complaint Counseling" after his initial contact with the EEOC wherein Plaintiff alleged discrimination based on "physical disability" and "age" and requested a "proper limited duty agreement or a fair job accommodation." ECF No. 157-5 at 1, 5. Thereafter, on April 23, 2015, Plaintiff had his initial EEOC interview. ECF No. 157 at 2, ¶ 10; ECF No. 157 at 3, ¶ 10. On April 28, 2015, Plaintiff was again marked AWOL for his failure to report his absence from work through the automated phone system or to contact his supervisor to notify his absence. ECF No. 152 at 11, ¶ 95; ECF No. 152-23 at 001.

On May 7, 2015 Plaintiff as issued a Letter of Warning for failure to follow safety procedures for driving with an expired license. ECF No. 152 at 11, ¶ 94; ECF No. 157 at 27, ¶ 94. On May 14, 2015, Plaintiff was issued a Notice of 7-day Suspension (No Time Off) and no loss of pay, alleging that Plaintiff had failed to notify some of his absences or was AWOL. ECF No. 152 at 11, ¶ 97; ECF No. 152-23 at 001; ECF No. 157 at 31 at ¶ 5A; ECF No. 157-16 at 1. However, both of Plaintiff's April 16 and April 28, 2015 AWOL markings were removed after Plaintiff filed a successful grievance. ECF No. 152 at 11, ¶ 90; ECF No. 157 at 26, ¶ 90.

On July 2, 2015 following pre-complaint processing, the EEOC issued Plaintiff a Notice of Right to File an Individual EEOC Complaint. ECF No. 152 at 2, ¶ 11; ECF No. 157 at 4, ¶ 11. Accordingly, on July 24, 2015, Plaintiff filed a formal EEOC complaint alleging discrimination based on age and disability, hostile work environment, retaliation, and violation of his FMLA rights. ECF No. 152 at 1, ¶ 4; 2, ¶ 12; ECF No. 157 at 5, ¶ 16; ECF No. 152-3 at 001, 005, 009, 010. Plaintiff identified Santos and Lugo as the responsible management officials. ECF No. 152 at 1, ¶ 5; ECF No. 152-3 at 001.

Plaintiff was once again placed on limited duties from August 6, 2015 through September 3, 2015 because of a "right sprain [in the] hip & thi[g]h. ECF No. 157-28 at 7. On August 17, 2015, the EEOC sent Plaintiff a letter (the "Letter of Acceptance") notifying the claims accepted for Investigation. ECF No. 152 at 2, ¶ 13; ECF No. 152-7 at 1–2. In the Letter of Acceptance the EEOC notified Plaintiff that incidents occurring 45 days before his EEOC contact were untimely. ECF No. 152 at 2, ¶ 14; ECF No. 157 at 4, ¶ 14. Forty-five days before Plaintiff's initial EEOC contact on April 6, 2015 was February 20, 2015. ECF No. 152 at 2, ¶ 14; ECF No. 157 at 4, ¶ 14. By October 16, 2015, Santos was working at another Post Office in Canóvanas, Puerto Rico. ECF No. 152 at 2, ¶ 7; ECF No. 157 at 3, ¶ 7.[12] After Santos left, Dávila accommodated Plaintiff by taking part of his Route 56 away and giving Plaintiff the buildings of Routes 5 and 6. ECF No. 157 at 47, ¶ 70; ECF No. 157-8 at 86, ¶¶ 9–21.

On October 28, 2015, a grand jury returned an indictment against Plaintiff charging violations for Theft of Government Property; and False Statements to Obtain Federal Employee Compensation. ECF No. 152 at 10, ¶ 81; ECF No. 157 at 25, ¶ 81. The indictment was related to the Federal Workers' Compensation forms (CA-17) and Application of Continuation of Pay forms (CA-1) that had been submitted regarding Plaintiff's January 8, 2015 knee injury. ECF No. 152 at 8, ¶ 60; ECF No. 152-11 at 38–39; ECF No. 157-2 at 59, ¶¶ 12–24; ECF No. 158 at 17. The next day, on October 29, 2015, Plaintiff was arrested at the Bayamón Branch Post Office. ECF No. 152 at 10, ¶ 82; ECF No. 157 at 25, ¶ 82.

On December 5, 2015, the EEOC completed the Report of Investigation ("ROI") that was sent to Plaintiff and the USPS. ECF No. 152 at 3, ¶ 18; ECF No. 157 at 5, ¶ 18. Following a jury trial, on October 19, 2016, Plaintiff was acquitted of all federal criminal charges for which he

---

[12] Plaintiff alleges that 'Santos left the Bayamón Branch sometime in the summer of 2015" but cites to no evidence in the record which supports this contention. ECF No. 158 at 27.

had been indicted. ECF No. 152 at 10, ¶ 84; ECF No. 157 at 25, ¶ 84. On January 28, 2017, Plaintiff received the Final Agency Decision by USPS denying his EEOC claims. ECF No. 152 at 3, ¶ 19; ECF No. 157 at 5, ¶ 19.

## III.   LEGAL STANDARD

### A.   Summary Judgment Standard

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992) (citations omitted). Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant presents a properly focused motion "averring 'an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). For issues where the nonmoving party bears the ultimate burden of proof, the party cannot merely "rely on an absence of competent evidence, but must affirmatively point to specific facts [in the record] that demonstrate the existence of an authentic dispute." McCarthy v. Nw.

15

Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citation omitted). The party need not, however, "rely only on uncontradicted evidence . . . . So long as the [party]'s evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Calero Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original) (citation omitted).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan, 904 F.2d at 115. There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## B.  The McDonnell Douglas Burden Shifting Framework

In all cases involving age discrimination, disability discrimination, FMLA claims, and retaliation, a plaintiff may either prove his case by presenting "direct evidence" or the plaintiff may use indirect evidence "by using the *prima facie* case and burden shifting methods" from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Ramos Echevarría v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir. 2011) (citing Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 511 (1st Cir. 1996)); (internal quotation marks omitted) (disability discrimination claims); Del Valle Santana v. Servicios Legales De Puerto Rico, Inc., 804 F.3d 127, 130 (1st Cir. 2015); Bonefont Igaravidez v. International Shipping Corp., 659 F.3d 120, 123–24 (1st Cir. 2011) (age

discrimination claims under ADEA); Hodgens v. General Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998); González Rodríguez v. Potter, 605 F. Supp. 2d 349, 370 (D.P.R. 2009) (FMLA claims and Title VII retaliation claims). The first step under the McDonnell Douglas framework is for a plaintiff is to establish a prima facie case of discrimination. "A prima facie case must be custom-tailored to fit both the particular animus (e.g., age discrimination, sex discrimination, race discrimination) and the particular type of employment decision involved (e.g., failure to hire, failure to promote, failure to retain)." Sánchez v. Puerto Rico Oil Co., 37 F.3d 712, 719 (1st Cir. 1994). If the plaintiff is successful in establishing a prima facie case, there emerges a rebuttable presumption of discrimination.

Once a prima facie case has been established, the inquiry moves to step two of the McDonnell Douglas framework wherein the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Brennan v. GTE Government Systems Corp., 150 F.3d 21, 26 (1st Cir. 1998). At step three, if the employer has articulated a non-discriminatory reason, the McDonnell Douglas framework "drops out of the picture" and the plaintiff once again shoulders the burden to demonstrate that the employer's legitimate reason was pretext, and that actual reason for the adverse employment action was the employer's discriminatory or retaliatory animus. Hernández Marrero v. Crowley American Transport, Inc., 206 F. Supp. 2d 279, 287 (D.P.R. 2002) (citing Pagues Cahue v. Iberia Líneas Aéreas de España, 82 F3d. 533, 536 (1996)); Fennel v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991)). Even so, "[o]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead

on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." <u>Fennel</u>, 83 F.3d at 535 (citing <u>Mesnick</u>, 950 F.2d at 827).

## IV.     ANALYSIS

### A.  AGE DISCRIMINATION, HARASSMENT, & HOSTILE WORK ENVIRONMENT UNDER ADEA

The ADEA provides that it is unlawful for an employer to "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). To succeed in an ADEA suit, the Plaintiff must show by direct or circumstantial evidence that age was the "but-for" cause of the challenged employer conduct. <u>Gross v. FBL Financial Services, Inc.</u>, 557 U.S. 167, 177 (2009). At the prima facie stage, a plaintiff's burden is "not onerous." <u>Brennan</u>, 150 F.3d at 26 (citing <u>Sánchez</u>, 37 F.3d at 719). "All that is needed is the production of admissible evidence which, if uncontradicted, would justify a legal conclusion of discrimination." <u>Id</u>. at 719. Defendant concedes that Plaintiff is a member of the protected class of employees over 40 years old for the purposes of a suit for age discrimination or age-related ~~or age~~ hostile work environment. [13] ECF No. 153 at 6; ECF No. 152 at 4, ¶ 29; ECF No. 157 at 8, ¶ 29. However, Defendant moves for summary judgment on all of Plaintiff's age-based claims, asserting that Plaintiff has failed to establish a prima facie claim of either age-based hostile work environment or of age-based discrimination.

---

[13] Despite acknowledging Plaintiff's protected class membership, Defendant disputes whether Santos was aware of Plaintiff's age because Mr. Santos denied knowing Plaintiff's age in his deposition. ECF No. 152-16 at 25, ¶¶ 11–15. However, Plaintiff notes that Mr. Santos must have known Plaintiff's age because it was listed on all his work records. ECF No. 152-11 at 00073, ¶ 10. Making all reasonable inferences in favor of the Plaintiff, a reasonable jury could conclude that Mr. Santos was aware of Plaintiff's age, and the assertion that Mr. Santos lacked knowledge cannot be the basis to grant Defendant's motion for summary judgment on Plaintiff's ADEA claims.

1. **The Prima Facie Burden of Age-Based Hostile Work Environment &
   Discrimination**

   a. **Age-Based Hostile Work Environment**

A hostile work environment claim may be pursued under ADEA. Collazo v. Nicholson,
535 F.3d 41, 44 (1st Cir.2008). The prima facie case of an ADEA hostile work environment
claim requires the plaintiff to produce evidence that " (1) he is a member of the class protected
by the ADEA; (2) he was subjected to unwelcome harassment; (3) the harassment was based on
age; (4) the harassment was sufficiently pervasive or severe so as to alter the conditions of the
plaintiff's employment and create an abusive work environment; (5) the objectionable behavior
was both subjectively and objectively offensive, such that a reasonable person would find it
hostile or abusive; (6) that the plaintiff found it hostile or abusive; and (7) some basis for
employer liability has been established." Gutiérrez Lines v. P.R. Elec. & Power Auth., 751 F.
Supp. 2d 327, 341–42 (D.P.R. 2010) (citing O'Rourke v. City of Providence, 235 F.3d 713, 728
(1st Cir.2001)).

In challenging Plaintiff's harassment and hostile work environment claim, Defendant
argues that Plaintiff has failed to produce evidence that age was the basis for any harassment that
Plaintiff suffered. ECF No. 153 at 6, 7, 10, 12.[14] Not all verbal or physical harassment in the
workplace is prohibited by the ADEA, instead, only that harassment which is based on age.
Gutiérrez Lines, 751 F. Supp. 2d at 341 ("the harassment was based on age"). In opposing
Defendant's motion for summary judgment, Plaintiff argues that Santos told him that he was
"too slow," and mocked him in front of other employees because "he would take 4 hours to case

---

[14] Regarding Plaintiff's age-based discrimination claims, Defendant also argues that Plaintiff's treatment was also
not so severe or pervasive to create a hostile working environment. ECF No. 153 at 6, 7. Even so, it is not necessary
to reach this issue because Plaintiff failed to cite any evidence in the record that Plaintiff's mistreatment was based
on age.

his route." ECF No. 158 at 23.[15] Statements ridiculing a person for being "slow" are not

necessarily statements based on age. A person might be "slow" for a variety of reasons,

regardless of whether they are young or old, and for reasons completely divorced from age. See

e.g. Youngs v. Meridian Pointe, 2010 WL 3937382, *3 (M.D. Fl. Oct. 6, 2010) ("the facially-

neutral comment that Youngs 'moved too slow' does not constitute direct evidence of age

discrimination."); Dodson v. FedEx Corp. Servs., Inc., 2015 WL 1335894, *7 (C.D. Cal. Apr. 6,

2015) ("Plaintiff's allegations that Hahn commented that she was "too slow," "taking too long,"

and needed to "speed it up" are facially neutral comments that, contrary to Plaintiff's argument,

do not suggest age discrimination.).[16] Evidence of mere statements to the effect that Plaintiff was

"slow," even if uncontradicted, fail to justify the conclusion that the harassment Plaintiff

experienced was based on age.

     Plaintiff also proffers other statements made by Santos that have nothing to do with age,

such as Santos' statement that "because of my condition, how slow I was, maybe I would leave

the post office . . ." ECF No. 157-2 at 63–64. While these statements may show a connection to

disability, these statements fail to show any nexus between age and harassment. A young person,

---

[15] With regard to Plaintiff, on an unidentified occasion or occasions, Santos would hurry up and yell at Plaintiff in front of other employees, saying that Plaintiff was "too slow." ECF No. 157 at 35, ¶ 17, ECF No. 157-2 at 62, ¶¶ 7–16; 63, ¶¶ 1–2.

[16] In contrast, courts have been willing to find that comments regarding a plaintiff's slowness were made based on the plaintiff's age if there are other additional statements that indicate some connection to age. See e.g. Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 47 (2d Cir. 2019) ("Finding a jury could "infer" that comments of "You're too old," "You don't have the energy," and would not have "the stamina" to do the job were euphemisms for age."); Moore v. Castro, 192 F. Supp. 3d 18, 47 84 (Finding that workplace reprimands about slowness or forgetfulness created a hostile work environment based on age, but that other comments such that plaintiff could not understand his assignments "because of his age" tipped the balance in favor of Plaintiff in finding an issue of material fact on age discrimination.); Sims v. MVM, Inc., 704 F.3d 1327, n. 11 (Finding that a reasonable juror could find the employer was motivated by discriminatory animus based on "weak" evidence that the Plaintiff was told he was "old and slow."). However, in the present case, no other statements in the record have been cited by Plaintiff which would provide any additional evidence that remarks about Plaintiff's slowness had any connection to age. Furthermore, even if there were any such statements, Plaintiff has not shown that they are more than stray remarks. Nelson v. United Parcel Service, Inc., 337 Fed. Appx. 561, 563 (7th Cir. 2009) (holding that comments that the plaintiff was "too old and too slow, as well as repeated references to him as Old Silver,' are nothing more than "stray remarks" disconnected from the decision to terminate Nelson and do not constitute an admission that he was fired because of his age.").

just as much as an older person, may suffer from conditions which affect their speed. Likewise, Santos' and Lugo's statements calling Plaintiff a "repeat offender" and a "cheater" lack any indication that they were related to Plaintiff's age. Plaintiff nevertheless asserts that he knows that the above statements were made to discriminate against him based on his age. ECF No. 157 at 6, ¶ 24; ECF No. 152-11 at 0010; 0036; 0085–86. However, such an assertion is purely conclusory and constitutes unsupported speculation insufficient to create a genuine issue of material fact to survive summary judgment. See Medina Muñoz, 896 F.2d at 8.

Finally, Plaintiff introduces evidence of a litany of other offensive behaviors to which Santos subjected employees at the Bayamón Branch post office, but not Plaintiff directly. More specifically, plaintiff brings evidence in support of the fact that most postal employees at the Bayamón Branch considered Santos a bully and abrasive because of his treatment toward the employees and some of the other supervisors. ECF No. 152 at 3, ¶ 25; ECF No. 157 at 6–7, ¶ 25. While at the post office, Santos could be heard "sending people to hell" and would say on many occasions, "Fuck the letter carriers. Let them arrive whenever they want. And whoever has a problem, well, fuck them." ECF No. 157 at 40, ¶ 33; 46–47, ¶ 66; ECF No. 157-8 at 129, ¶¶ 6–20; ECF No. 157-22 at 66, ¶¶ 5–10; 85, ¶¶ 3–21. Santos had also called one mail carrier a "piece of shit," and invited fellow-supervisor Moyeno to "fight" at some undefined time. ECF No. 157 at 40, ¶ 33; ECF No. 157 at 42, ¶ 42; ECF No. 157-8 at 56, ¶¶ 10–15; ECF No. 157-22 at 66, ¶¶ 5–10; 85, ¶¶ 3–21. Santos also said on many occasions "if [the USPS employees] didn't like how he was then they could step outside and solve the problems as men, because he was from Carolina." ECF No. 157 at 39, ¶¶ 30A; ECF No. 157-8 at 46, ¶¶ 15–25; 47, ¶¶ 1–5.

Because of these behaviors, plaintiff contends, many of the letter carriers did not get along with Santos. ECF No. 157 at 41, ¶ 38; ECF No. 157-8 at 22, ¶¶ 3–7. On one unspecified

occasion, after Santos spoke in a way that some letter carriers found offensive, fourteen letter carriers staged a boycott the next day. ECF No. 157 at 42, ¶ 44; ECF No. 157-8 at 61, ¶¶ 5–12. As a result, in a labor-related management meeting held on an unspecified date, and with regards to Santos, the Union stipulated that Santos could no longer be "yelling curse words out on the floor," including "son of a bitch, motherfucker, [and] fag . . . ." and that he "had to treat people with respect and dignity." ECF No. 157 at 38, ¶ 26; ECF No. 157-7 at 32, ¶¶ 2–25; 33, ¶¶ 21–25; 34, ¶ 1.[17]

Despite the reprehensible lack of civility displayed by these behaviors, such as Santos' generally unpleasant and improper behavior of yelling "curse words" or challenging other employees to fights, these incidents have no connection to age. See ECF No. 157 at 38, ¶ 26; ECF No. 157-7 at 32, ¶¶ 2–25; 33, ¶¶ 21–25; 34, ¶ 1. In sum, nothing Santos did to Plaintiff or any other employee hints that age was the reason for Santos' behavior. Because Plaintiff fails to produce admissible evidence showing that either Santos' or Lugo's allegedly harassing statements or acts had any connection to age, Plaintiff fails to establish a prima facie case of a hostile work environment based on age.

### b. Age-Based Discrimination

The prima facie case of age discrimination under the ADEA requires a plaintiff to produce evidence that demonstrates (1) he was at least 40 years old; (2) his work was "sufficient to meet the employer's legitimate expectations"; (3) his employer took adverse action against him; and (4) "the employer did not treat age neutrally in taking the adverse action." Del Valle Santana, 804 F.3d at 130; Brennan, 150 F.3d at 26. Defendant does not allege that Plaintiff was

---

[17] Notwithstanding Santos' behavior, Lugo did not discipline him. ECF No. 157 at 39, ¶ 30; 47, ¶ 67; ECF No. 157 at 69, ¶¶ 3–9; ECF No. 157-8 at 130, ¶¶ 2–12.

unable to perform as a letter carrier. ECF No. 153 at 18. Defendant merely argues that Plaintiff cites no evidence that "he was treated less favorably than substantially younger employees . . ." or that Plaintiff has identified any similarly situated employee under 40 who was treated in a more favorable way. ECF No. 152 at 4, ¶ 32; ECF No. 152-8 at 143; ECF No. 153 at 24.

Plaintiff controverts Defendant's argument asserting that Santos' "buddies" were treated better than Plaintiff and that any letter carriers that were Santos' "friends" would receive better treatment. ECF No. 157 at 41, ¶ 41; ECF No. 157-8 a 57, ¶ 25; 58. ¶¶ 1–2. However, not belonging to Santos' group of friends is not a protected class. Plaintiff cites no evidence as to the age of Santos' "buddies" that would create a reasonable inference that Santos' friends' preferential treatment was somehow connected to their age. Therefore, the mere fact that Santos treated his friends better, without more, could not lead a reasonable jury to conclude that he did not treat age neutrally.

Secondly, Plaintiff contends that he was subject to a "special procedure" whereby all disciplinary and injury matters for Plaintiff had to go through Santos. ECF No. 158 at 24; ECF No. 157 at 42, ¶ 46; 47, ¶ 68; ECF No. 157-8 at 68, ¶¶ 22–24; 134, ¶¶ 1–19. Even assuming that Plaintiff was the only employee subject to this special procedure, Plaintiff has cited to no evidence in the record that shows this procedure had anything to do with age, thereby not treating age neutrally. This special procedure could have been imposed on Plaintiff for many different reasons, and Plaintiff cites to no evidence that would lead to a reasonable inference that his special treatment was because of age. Plaintiff likewise cites no evidence of any similarly situated employee under 40 to which Plaintiff's treatment can be compared. Thus, no reasonable inference can be drawn that Plaintiff's "special" arrangement under Santos had anything to do with his age and that his employer's actions did not treat age neutrally.

Finally, Plaintiff contends that the inspection of Plaintiff's route by a younger employee "with no physical injuries or limitations" is evidence of discrimination based on age and disability. ECF No. 158 at 24; ECF No. 157 at 25–26, ¶ 87; ECF No. 157-17 at 1.[18] Here, Plaintiff has shown that the route inspection conducted in his name was completed by a much-younger mail carrier, who was 28 years old. ECF No. ECF No. 157-17 at 1. However, Plaintiff does not explain why assigning a route inspection to somebody else while Plaintiff was out on leave constitutes an adverse employment action. Yet, even if arguendo, with regard to the route inspection alone, Plaintiff has adduced enough evidence to proceed to the second step of the McDonnell Douglas framework, as discussed further below, Plaintiff's age discrimination claim ultimately fails.

### 2. Defendant's Legitimate, Non-Discriminatory Reason

Once a plaintiff has made a prima facie case creating a presumption of discrimination, the employer must then offer a legitimate, nondiscriminatory reason for the adverse action to overcome the presumption. Mesnick, 950 F.2d at 825. If the employer fails, "then the inference of discrimination created by the prima case persists, and the employer's attempt to secure summary judgment should be rebuffed." Id. However, at step two, the employer's burden to show a legitimate, nondiscriminatory reason is "one of production not persuasion" wherein "the employer need do no more than articulate a reason which, on its face, would justify a conclusion" that the action was taken for a nondiscriminatory motive. Bonefont Igaravidez, 659 F.3d at 124 (citing Dávila v. Corporación de P.R. Para La Difusión Pública, 498 F.3d 9, 16 (1st Cir. 2007)).

---

[18] Plaintiff also alleges that comments about his slowness were somehow related to the inspection by the younger carrier. ECF No. 157-2 at 62, ¶¶ 24–25; 63, ¶¶ 1–2. However, Plaintiff has not pointed to any evidence to suggest that the substitute route inspector was assigned the task because he was faster than Plaintiff nor of even at least a temporal proximity between the decision to conduct the route inspection and the remarks about slowness.

Defendant asserts that no decision by Santos, like the route inspection assignment temporarily filled by another employee during Plaintiff's 45-day leave of absence, was made taking into account Plaintiff's age or disability status. ECF No. 152 at 4, ¶ 33; ECF No. 152-4 at 007. According to Santos, unassigned letter carriers bid to cover a route temporarily when the regular carrier is on leave for more than five days. ECF No. 152-4 at 007. The letter carrier who successfully bid to cover Plaintiff's route while Plaintiff was on leave was Jorge Vélez ('Mr. Vélez"). ECF No. 152-4 at 007. While Plaintiff was out on leave and Mr. Vélez was covering Plaintiff's route, the day arrived to perform the yearly required "Street Observation" of Plaintiff's route. ECF No. 152-4 at 007. Because Mr. Vélez was covering Plaintiff's route while Plaintiff was on leave, Mr. Vélez performed the yearly street observation. ECF No. 152-4 at 007. However, the paperwork submitted after the street observation requires the name of the regularly assigned employee of the route. ECF No. 152-4 at 007. Therefore, because Mr. Vélez was only temporarily covering Plaintiff's route, Plaintiff's name was put on the paperwork rather than Mr. Vélez's. ECF No. 152-4 at 007. Furthermore, Santos explains that "[r]oute adjustments are not made on the basis of these 'Street Observation[s].'" ECF No. 152-4 at 007. Santos' explanation successfully articulates on its face a legitimate and non-discriminatory reason why Plaintiff's route inspection was conducted by a younger employee. As such, Defendant has fulfilled its burden of production to show a legitimate nondiscriminatory reason defeating the presumption of age discrimination.

### 3. Proof of Pretext

Once Plaintiff and Defendant have made a showing as to the first two steps of the McDonnell Douglas framework, at step three "courts confronted by summary judgment motions must at this point focus on the ultimate question, scrapping the burden-shifting framework in

favor of considering the evidence as a whole." Mesnick, 950 F.2d at 827. Once the presumption

has been defeated by a legitimate and nondiscriminatory reason, a plaintiff must "elucidate

specific facts which would enable a jury to find that the reason given is not only a sham, but a

sham intended to cover up the employer's real motive: age discrimination." Soto Feliciano v.

Villa Cofresí Hotels, Inc., 779 F.3d 19, 25 (1st Cir. 2015) (citing Mesnick, 950 F.2d at 824).

Accordingly, "a plaintiff must offer some minimally sufficient evidence, direct or indirect, both

of pretext and of the employer's discriminatory animus" to prevail over a motion for summary

judgment. Mesnick, 950 F.2d at 827.

   Plaintiff fails to produce any evidence that would enable a jury to find that the

Defendant's proffered reason is a sham to cover discriminatory animus. The mere fact that a

younger letter carrier was used to inspect Plaintiff's route is not enough to show that Defendant's

proffered reason was pretext. During the time that Plaintiff worked at the Bayamón Branch Post

Office most of the letter carriers were over 40 years old. ECF No. 152-15 at 63, ¶¶ 15–25; ¶¶ 1–

19. However, most of the letter carriers at the Bayamón Branch were younger than the Plaintiff.

ECF No. 157 at 38, ¶ 25; ECF No. 157-7 at 15, ¶¶ 9–25, 16, ¶¶ 1–2. Accordingly, a younger

carrier was likely to have bid to take Plaintiff's route while he was absent from the office, simply

because most of the letter carriers were younger than Plaintiff. As such, even considering the

route inspection in the context with the rest of the evidence as a whole, none of the other

statements or comments made to Plaintiff point to any connection to age, and so they do not

support an assertion of age-based animus when examined together with the route inspection.

   In sum, the mere fact that a younger employee was used for the inspection alongside

unsupported speculation about Santos and Lugo's motive, in context with the evidence as a

whole, does not satisfy Plaintiff's minimal burden to show that his superiors' reasons were a

sham used to cover a discriminatory animus. Because Plaintiff fails to cite evidence which could convince a reasonable jury that age was the basis for any discriminatory or harassing treatment, he fails to sustain his burden of showing pretext for discriminatory animus. Therefore, Plaintiff's claims for discrimination and hostile work environment under ADEA must be dismissed.

## B. DISABILITY CLAIMS UNDER THE REHABILITATION ACT

### 1. Whether Plaintiff is "Disabled" Under the Rehabilitation Act

As a threshold manner, Defendant urges that Plaintiff is not disabled under the definition of the Rehabilitation Act. ECF No. 153 at 12–15. Each of Plaintiff's hostile work environment, discrimination, and failure to accommodate claims under the Rehabilitation Act require that the Plaintiff be considered "disabled" under the Rehabilitation Act. See Marshall v. Potter, 2009 WL 3200046, at *17–18 (D.P.R. Sept. 30, 2009) ("To establish a claim of discrimination under the [Rehabilitation] act, a plaintiff must prove . . . that he is disabled within the meaning of the act . . . ."); Calero Cerezo, 355 F.3d at 20 ("To assert a claim for failure to accommodate under the Rehabilitation Act, a plaintiff must establish . . . that he suffers from a "disability" within the meaning of the statute . . . ."); McDonough v. Donahoe, 673 F.3d 41, 49 (1st Cir. 2012) ("In order to succeed on her hostile work environment claim [plaintiff] must show the following . . . [that] she was disabled as defined under the Rehabilitation Act . . . .").

Under the definition of the Rehabilitation Act, as amended by ADA Amendments Act of 2008 (ADAAA),[19] an individual qualifies as disabled if he has a physical or mental impairment that substantially limits one or more major life activities, the plaintiff has a record of such an

---

[19]The same standards apply to claims under the Rehabilitation Act and the Americans with Disabilities Act ("ADA"). Calero Cerezo, 335 F.3d at 11 n. 1. Therefore, courts look to caselaw regarding the ADA and the Rehabilitation Act interchangeably. See Parker v. Universidad de Puerto Rico, 225 F.3d 1, 4 (1st Cir. 2000) ("Title II [of the ADA], the provision at issue here, prohibits discrimination against persons with disabilities by "public entities," and is modeled on § 504 of the Rehabilitation Act . . . applying Title II, therefore, we rely interchangeably on decisional law applying § 504.").

impairment, or if the plaintiff is regarded as having such an impairment. <u>Mancini v. City of Providence by and through Lombardi</u>, 909 F.3d 32, 39 (1st Cir. 2018) (citing 42 U.S.C. § 12102(1)(A)–(1)(C)).[20] A physical impairment is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems." <u>Id</u>. (citing 29 C.F.R. § 1630.2(h)). A plaintiff's impairment must create a substantial limitation on one or more of the plaintiff's major life activities. <u>Id</u>. The ADAAA provides an unexhaustive list of what qualifies as a "major life activity," which includes, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). At summary judgment, a plaintiff must identify the major life activity being affected and provide enough evidence to "create a genuine issue of material fact as to whether his impairment substantially limits one or more major life activities." <u>Mancini</u>, 909 F.3d at 42–43.

It is a "relatively low bar" at summary judgment for a plaintiff to show evidence of his limitation, and a "plaintiff's detailed description of his limitations, standing alone, often will be sufficient." <u>Id</u>. at 44 (citing <u>Williams v. Tarrant Cty. Coll. Dist.</u>, 717 F. App'x 440, 448 (5th Cir. 2018)). "A relatively low bar, though, is not the same as no bar at all. [A plaintiff] must still be

---

[20]Generally, a plaintiff may also assert a prima facie case that they were "regarded as" disabled under the <u>McDonnell Douglas</u> framework. <u>Mancini</u>, 909 F.3d at 46. A plaintiff may be regarded as disabled under the Rehabilitation Act when the plaintiff presents a claim of "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). When a plaintiff asserts they were regarded as disabled, "[i]t is not necessary for the plaintiff to prove that the impairment limits or is perceived to limit a major life activity." <u>Mancini</u>, 909 F.3d at 46. However, while Plaintiff argues that he is a qualified individual with a disability he does not argue in his motion in opposition to Defendant's motion for summary judgment that he was "regarded as" or "perceived" as disabled. Plaintiff merely asserts that his limited duties and accommodations are proof that he is disabled under the Rehabilitation Act. ECF No. 158 at 10; 26. Because Plaintiff did not raise that he was regarded as or perceived as disabled at summary judgment, that argument will not be taken into consideration. <u>Mancini</u>, 909 F.3d at 46 ("Courts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion.") (citing <u>McCoy v. Massachusetts Institute of Technology</u>, 950 F.2d 13, 22, 22 n. 7 (1st Cir. 1991) ("Overburdened trial judges cannot be expected to be mind readers.")).

able to point to some competent evidence in the summary judgment record sufficient to show substantial limitation." <u>Mancini</u>, 909 F.3d at 44. Importantly, "a determination as to whether this 'substantially limits' requirement has been satisfied calls for a comparison between the plaintiff's limitations and those of the majority of people in the general population." <u>Mullen v. New Balance Athletics, Inc.</u>, 2019 WL 958370 at *5 (D. Me. Feb. 27, 2019).

This court has previously cited to the EEOC proposed rules as an indicator of Congressional intent regarding whether a certain condition qualifies as a substantial limitation in a major life activity to constitute a disability under the ADAAA. <u>García Hicks v. Vocational Rehabilitation Admin.</u>, 148 F. Supp. 3d 157, 167 (D.P.R. 2015); <u>Mercado Córdova v. Walmart Puerto Rico, Inc.</u>, 369 F. Supp. 3d 336, 352–53 (D.P.R. 2019) (both citing EEOC Proposed Rules, 74 Fed. Reg. at 48442). Under the EEOC proposed regulations, "a back impairment is sometimes considered a disability." <u>Mercado Córdova</u>, 369 F. Supp. 3d at 352 (citing EEOC Proposed Rules, 74 Fed. Reg. at 48442). Of particular applicability in this case, this court has recognized that under the EEOC proposed rules, "an individual with a back impairment that limits standing, walking, or lifting over twenty pounds and that is expected to last for several months is an individual with a disability." <u>Garcia Hicks</u>, 148 F. Supp. 3d at 167 (citing EEOC Proposed Rules, 74 Fed. Reg. at 48442); <u>see also Mercado Córdova</u>, 369 F. Supp. 3d at 353.

In this case, the Plaintiff has cited sufficient to create a genuine issue of material fact as to whether he was substantially limited in the major life activity as recognized by this court and the EEOC proposed rules. It is undisputed that before 2013 Plaintiff had not been diagnosed with a permanent medical condition. ECF No. 152 at 7, ¶ 57; ECF No. 157 at 16, ¶ 57. However, in his complaint, Plaintiff alleges that he is "restricted in his multiple major life activities, including but not limited to, the condition, manner and duration under which he can move, walk and

interact with others, as compared to the ability of a person in the general population to perform these activities." ECF No. 28 at 26. Furthermore, Plaintiff asserted that "[h]is limitations include[ed] walking not more than 3-4 hours a day, not carrying more than 20 pounds and no use of shoulder bag or satchel . . . ." ECF No. 28 at 6.

In support of his argument that his limitations constituted disability, Plaintiff cites to his Duty Status Reports ("CA-17s") showing that he was placed on limited duties and accommodated. ECF No. 158 at 26. The record evidence indicates that Plaintiff was placed on limited duties from September 11, 2013 through November 6, 2013 because of "bulging disk C3-C4" and "[p]aracentral disprotrusion C5-C6." ECF No. 157-28 at 3. The CA-17s which were submitted as record evidence also indicate that in December 2013, June 2014, and July 2014, Plaintiff's physicians reported that Plaintiff suffered a herniated disk and complained of severe back and neck pain and left leg numbness. ECF No. 157-28 at 4–6.

Accordingly, from September 11, 2013 to November 6, 2013 Plaintiff's physicians assessed that Plaintiff could only lift 15 pounds continuously and 40 pounds intermittently for two hours per day. ECF No. 157-28 at 3. However, from December 10, 2013 to January 31, 2014, June 9, 2014 to July 21, 2014, and July 31, 2014 to August 26, 2014, Plaintiff's physicians indicated in the associated CA-17s that Plaintiff was only able to lift 15 pounds continuously, and 20 pounds intermittently for two hours a day. ECF No. 157-28 at 4–6. During all the above periods, the physicians assessed that Plaintiff could walk for up to seven hours a day. ECF No. 157-28 at 4–6. For that reason, during the same periods established above, Plaintiff was given "specific limited duties" including that he not work "overtime." ECF No. 157-28 at 3–6. Beginning on December 2013, when Plaintiff was assessed to be only able to lift 20 pounds

intermittently, the CA-17s for that date and all subsequent dates also specify that plaintiff should not use a shoulder "satchel." ECF No. 157-28 at 4–6.

Plaintiff has succeeded in demonstrating evidence which creates a reasonable dispute of fact that he suffers from a back impairment. The same evidence indicates that Plaintiff was affected by this back impairment for at least several months from September 2013 to November 2014 and from June to August 2014. Furthermore, Plaintiff's impairments limited his lifting ability to only 20 pounds at intermittent intervals and he has not been able to use his shoulder satchel while completing his route. As previously pronounced by this court, an individual with a back impairment that "limits lifting over twenty pounds and that is expected to last for several months is an individual with a disability." Garcia Hicks, 148 F. Supp. 3d at 167 (citing EEOC Proposed Rules, 74 Fed. Reg. at 48442); see also Mercado Córdova, 369 F. Supp. 3d at 353. Therefore, it is clear that Plaintiff has succeeded in producing evidence which creates a genuine issue of material fact as to whether his impairment substantially limits one or more major life activities. A reasonable jury could conclude that Plaintiff was substantially limited in his ability to lift and was therefore disabled.[21]

### 2. The Prima Facie Cases of Failure to Accommodate, Disability Discrimination, and Disability-Based Hostile Work Environment.

Plaintiff has demonstrated a dispute of material fact with regard to the first element of each of his Rehabilitation Act claims for failure to accommodate, disability discrimination, and disability-based hostile work environment. Marshall, 2009 WL 3200046, at *17–18; Calero

---

[21] It is less clear whether Plaintiff is substantially limited in his ability to walk. The CA-17s to which Plaintiff cites indicate that Plaintiff could walk for up to seven hours a day—not the three to four hours a day which he alleges in his complaint. ECF No. 157-28 at 4–6. The first time that a CA-17 in the record indicates that Plaintiff could only walk for four hours a day was in August of 2015—long after the allegedly discriminatory or retaliatory actions taken against him that form the basis of this case. ECF No. 157-28 at 7. Plaintiff nevertheless introduced other evidence that his accident on January 8, 2015 limited the arc of movement in his knee from 0 to 70 degrees. ECF No. 157 at 35, ¶ 16; ECF No. 157-15 at 54, ¶¶ 12–15; 55, ¶¶ 2–16.

Cerezo, 355 F.3d at 20; McDonough, 673 F.3d at 49. The court now turns to the rest of the

elements in the prima facie cases of each claim–the first step under the McDonnell Douglas test.

### a. Failure to Accommodate

After establishing a dispute of material fact as to the first element, to assert a prima facie

claim under the Rehabilitation Act for failure to accommodate, a plaintiff must also demonstrate

a dispute of material fact that the plaintiff was able to perform the essential functions of his job;

and despite knowing about the plaintiff's disability, the defendant did not offer a reasonable

accommodation to the Plaintiff. Calero Cerezo, 355 F.3d at 20. In this case, there is no dispute

that Plaintiff was able to perform the essential functions of his job. ECF No. 153 at 14. Nor does

Defendant argue that Plaintiff's supervisors were not aware of his alleged physical limitations.

Instead, Defendant argues that there is no dispute of material fact that USPS did try to

accommodate Plaintiff when Plaintiff claimed he was injured. ECF No. 153 at 18. Defendant

also argues that Plaintiff's claims for having been denied reasonable accommodations are

untimely because all incidents leading to those claims occurred more than 45 days before

Plaintiff's April 6, 2015 EEOC contact. ECF No. 153 at 15.

Although the First Circuit has not yet decided directly whether a federal employee

bringing an action under the Rehabilitation Act must exhaust administrative remedies before

filing suit in court, it has noted that other circuits "have uniformly held that a federal employee

wishing to bring suit under the Rehabilitation Act must first exhaust administrative remedies."

Rivera Muñoz v. Shinseki, 212 F. Supp. 3d 306, 309 (D.P.R. 2016); Vázquez Rivera v. Figueroa,

759 F.3d 44, 47 n. 2 (1st Cir. 2014); see also Bartlett v. Department of the Treasury (I.R.S.), 749

F.3d 1, 8 (1st Cir. 2014). Therefore, in order to properly exhaust his administrative remedies, an

employee must initiate contact with an EEOC counselor within 45 days of the allegedly

discriminatory act. <u>Green v. Brennan</u>, 578 U.S. 547, 553 (2016); <u>Velázquez Rivera v. Danzig</u>,

234 F.3d 790, 794 (1st Cir. 2000); <u>see also</u> <u>Bartlett</u>, 749 U.S. at 3; 29 CFR § 1614.105(a)(1).[22]

The parties do not dispute that the USPS did in fact accommodate Plaintiff with limited

duties from September 11, 2013 through November 6, 2013, from December 11, 2013 until

January 31, 2014, from June 9, 2014 until July 21, 2014, and from July 31 2014, until August 26,

2014. Furthermore, after the allegedly discriminatory and retaliatory events at issue in this case,

Plaintiff was again placed on limited duties from August 6, 2015 through September 3, 2015.

Plaintiff produced evidence which tends to show that he was first denied reasonable

accommodations on August 19, 2014 when he informed Santos of his accommodation

arrangements with Lugo, but Santos told Plaintiff that Lugo could "stick" the arrangement "up

his ass." ECF No. 157-22 at 101, ¶¶ 2–16. Subsequently, on August 22, 2014 and October 1,

2014, when Plaintiff requested "auxiliary assistance" for his route, Santos denied both requests.

ECF No. 157 at 30, ¶ 3A–4; ECF No. 157-6 at 2, ¶ 4–5. Plaintiff also raises his OWCP claim

which he submitted on November 24, 2014 but which Manager Lugo controverted on December

3, 2014. ECF 152 at 7, ¶ 50; ECF No. 152-1 at 181, ¶¶ 3–25; ECF No. 152-5 at 151, ¶¶ 1–14;

ECF No. 152-20 at 1; ECF No. 157 at 15, ¶ 50. The parties do not dispute that the EEOC notified

Plaintiff that incidents which had occurred 45 days before his EEOC contact were untimely, and

that February 20, 2015 was the date falling 45 days before Plaintiff's initial contact with an

---

[22] Defendant only raised an exhaustion argument with regard to Plaintiff's failure to accommodate claims. Even if Defendant did not intend to limit the argument to that claim, with regard to harassment and hostile work environment, "[s]o long as one instance of harassment falls within the statutory limitations period . . . the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." <u>Nieves Borges v. El Conquistador Partnership, L.P., S.E.</u>, 936 F.3d 1, 8 (1st Cir. 2019) (citing <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 117 (2002); <u>Franchina v. City of Providence</u>, 881 F.3d 32, 47 (1st Cir. 2018) (internal quotations omitted)). Harassment can constitute an adverse employment action for both claims of discrimination and hostile work environment. <u>Colón Fontanez v. Municipality of San Juan</u>, 660 F.3d 17, 37 (1st Cir. 2011); <u>see also</u> <u>Noviello</u>. Because several instances of harassment allegedly based on disability occurred after February 20, 2015, Plaintiff's Rehabilitation Act claims based on disability discrimination and disability-based hostile work environment are not precluded by the 45-day contact requirement, as further discussed below.

EEOC counselor.[23] ECF No. 152 at 2, ¶ 14; ECF No. 157 at 4, ¶ 14. Each incident which occurred on August 19, August 22, October 1, and December 3, 2014 all happened before February 20, 2015, and Plaintiff therefore failed to contact an EEOC counselor within 45 days of these allegedly discriminatory acts. As such, Plaintiff has failed to exhaust his administrative remedies with regard to these incidents and they cannot form a basis for a claim for failure to accommodate.[24]

The only clearly identifiable request for reasonable accommodation that occurred after February 20, 2015 was when Plaintiff submitted a CA-17 form on February 27, 2015 following his January 8, 2015 accident. ECF No. 157 at 17, ¶ 59; ECF No. 152-1 at 109–10; ECF No. 152-11 at 38–39, ¶ 107. However, Plaintiff points to no evidence in the record, nor does he even allege that he was denied reasonable accommodations or limited duties in relation to his January 8, 2015 injury.[25]

Finally, Plaintiff testified in his deposition, and Defendant does not dispute, that on the route Plaintiff worked in 2014 and 2015, the USPS did not take the heavy packages off of his route in accordance with Plaintiff's lifting limitations. ECF No. 157 at 32, ¶ 9; ECF No. 157-2 at 52, ¶¶ 17–24. Plaintiff also testified that sometimes he was forced to take packages that were too heavy for his limitations. ECF No. 157-2 at 53, ¶¶ 9–17. While Plaintiff does not explicitly

---

[23] Plaintiff acknowledges that the letter was sent and that it contained the above information, but the Plaintiff disputes that it has a preclusive effect on the above litigation. However, despite acknowledging the letter and its contents, the Plaintiff does not raise any argument based on equitable tolling or equitable estoppel for his denial of reasonable accommodations. See e.g., Stubbe v. McDonough, 2022 WL 705489, *4 (D. Mass. 2022); 29 C.F.R. § 1614.105(a)(2). Instead, Plaintiff argues that Fantini v. Salem State Coll., 557 F.3d 22, 26–27 (1st Cir. 2009) prevents any preclusive exhaustion of remedies argument. However, Fantini is inapposite as it does not address or even mention the 45-day requirement described above.

[24] Plaintiff may, however, draw on these events to show disability-based harassment and hostile work environment. Nieves Borges, 936 F.3d at 8; supra note 20.

[25] Indeed, the CA-17 from February 27, 2015 is not included in the record by either party. The only allegations regarding Plaintiff's request for accommodation after his January 8, 2015 accident involve a claim that Santos and Lugo fabricated a criminal case against him with regard to documents involved in that accident. Plaintiff, however, does not allege or show proof that he was denied any reasonable accommodations in connection to his January 8, 2015 accident.

identify the dates on which the heavy packages were not taken off his route, Plaintiff testified

that it was done on the route he worked in 2014 and 2015. ECF No. 157-2 at 52, ¶¶ 17–24. It is

undisputed that Plaintiff worked Route 56 between August 2014 until at least the summer or fall

of 2015. ECF No. 158 at 27; ECF No. 157 at 47, ¶ 70; ECF No. 157-8 at 85, ¶¶ 17–25; 86, 1–21.

Therefore, to the extent that a reasonable jury could find that Plaintiff was denied reasonable

accommodations when heavy packages were not taken off his route after February 20, 2015,

Plaintiff succeeds in establishing a prima facie claim for failure to accommodate under the

Rehabilitation Act with regard to his lifting limitations only.

### b.  Disability-Based Discrimination & Disability-Based Hostile Work Environment

To assert a prima facie claim for disability discrimination under the Rehabilitation Act, a

Plaintiff must produce evidence that (1) he is disabled under the meaning of the act; (2) he was

qualified able to perform the essential functions of his job, with or without reasonable

accommodation; and that (3) his employer took adverse employment action against him because

of his disability. Marshall, 2009 WL 3200046, at *17–18; Vélez Ramírez v. Commonwealth of

Puerto Rico, 827 F.3d 154, 157 (1st Cir. 2016); Colón Fontanez, 660 F.3d at 32.

A disability harassment and a disability hostile work environment claim both require

essentially the same showing by a plaintiff as disability discrimination, with some additional

elements. The plaintiff must produce evidence to show (1) he was disabled under the definition

of the Rehabilitation Act; (2) he was subjected to unwelcome harassment; (3) his employer's

conduct was based on his disability; (4) the harassment was objectively and subjectively

offensive; (5) the employer knew or should have known of the harassment and did not take

prompt remedial action; and (6) there exists some basis for employer liability. McDonough, 673

F.3d at 46; Hernández Echevarría v. Walgreens de Puerto Rico, 121 F. Supp. 3d 296, 307

(D.P.R. 2015) (citing <u>Southern Regional Physician Servs., Inc.</u>, 247 F.3d 229, 235 (5th Cir. 2001)); <u>O'Rourke v. City of Providence</u>, 235 F.3d 713, 728 (1st Cir. 2001).[26]

As already discussed above, Plaintiff has succeeded in presenting evidence regarding his disability status, and there is no dispute that the Plaintiff was able to perform the essential functions of his job. Defendant challenges both Plaintiff's disability discrimination and disability-based hostile work environment claims on the same two bases. Defendant argues that (1) no mistreatment was related to Plaintiff's alleged disability, and (2) any mistreatment which Plaintiff suffered was not severe or pervasive enough to create a hostile work environment constituting an adverse employment action. ECF No. 153 at 6–7. In the First Circuit, harassment may indeed constitute an adverse employment action for a discrimination claim as well as for a hostile work environment claim. <u>Colón Fontanez</u>, 660 F.3d at 37 ("However, demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees may constitute adverse employment action, subject to the facts of a particular case") (internal quotations omitted); <u>see also</u> <u>Noviello</u>, 398 F.3d at 89. Accordingly, Defendant's arguments with regard to Plaintiff's discrimination and hostile work environment claims will be analyzed together.

A hostile work environment which constitutes an adverse employment action requires that plaintiff show, at summary judgment, a genuine dispute of material fact that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Valentine Almeyda v. Municipality of Aguadilla</u>, 447 F.3d 85, 94 (1st

---

[26] A showing of disability harassment and disability hostile work environment are subtly different. However, because the elements which mark their differences are not at issue in this motion for summary judgment, there is no reason to elaborate further. <u>Compare</u> <u>McDonough</u>, 673 F.3d at 46 with <u>Hernández Echevarría</u>, 121 F. Supp. 3d at 307 and <u>O'Rourke</u>, 235 F.3d at 728.

Cir. 2006). The acts of harassment must also be objectively and subjectively offensive. McDonough, 673 F.3d 41, 46. Acts that are less pervasive must be more extreme to meet the standard of severity. Rivera Rivera v. Medina & Medina, Inc., 898 F.3d 77, 93 (1st Cir. 2018); Arce v. Potter, 818 F. Supp. 2d 402, 413 (D.P.R. 2011) ("If actions do not meet the pervasive requirement, even incidents that seem severe will not satisfy the requirement.").

As such, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment to establish an objectively hostile or abusive work environment . . ." Rivera Rivera, 898 F.3d at 93 (citing Colón Fontánez v. Municipality of San Juan, 660 F.3d 17, 44 (1st Cir. 2011); Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotations omitted). Individual acts considered in isolation may not be "severe," so a court is required to assess the "totality of the circumstances," and whether the harassing conduct unreasonably interfered with the plaintiff's work performance. Valentine Almeyda, 447 F.3d at 94.

Plaintiff cites abundant evidence that Santos mocked the letter carriers, used "curse words" like "fuck," "son of a bitch, motherfucker, [and] fag," called one letter carrier a "piece of shit," sent "people to hell," and invited other employees to fight. ECF No. 157-7 at 32, ¶¶ 2–25; 33, ¶¶ 21–25; 34, ¶ 1; ECF No. 157-8 at 46, ¶¶ 15–25; 47, ¶¶ 1–5; 56, ¶¶ 10–15; 129, ¶¶ 6–20; ECF No. 157-22 at 66, ¶¶ 5–10; 85, ¶¶ 3–21. However, Plaintiff does not allege that any of the aforementioned conduct was directed specifically at him nor does any one of these statements indicate they were made based on disability, age, or in retaliation for some protected conduct. ECF No. 157-25 at 1. Plaintiff essentially argues that Santos created a generally uncomfortable and disrespectful atmosphere at the Bayamón Branch post office. But a generally uncomfortable

workplace or an unprofessional, disrespectful, and tactless boss is not equivalent to a hostile work environment for the Plaintiff specifically.

However, Santos and Lugo made other statements to Plaintiff which, considered under the totality of the circumstances and taking all inferences in favor of the Plaintiff, a jury could conclude the USPS's conduct was based on his disability. For example, on August 19, 2014, when Plaintiff had notified Santos of a previous limited duty arrangement which Plaintiff had with Lugo, Santos replied that Lugo could "stick that arrangement up his ass because he was the one that was there, and he was the one that would decide what was going to be done there." ECF No. 157-22 at 101, ¶¶ 2–16. Being told that your disability accommodations can be stuck up somebody's "ass" is objectively and subjectively offensive and was uttered in the context of a conversation regarding Plaintiff's alleged disabilities.

Furthermore, on March 12, 2015 Santos remarked to Plaintiff that he had "an accident on every route he was on" and that he was a "cheater and a "hustler." Santos and Lugo also referred to Plaintiff as a repeat offender on December 3, 2014 and March 12, 2015. ECF No. 157-2 at 54, ¶¶ 13–22; ECF No. 152-5 at 151, ¶¶ 1–14. These comments could indicate to a reasonable jury that the supervisors' statements had some connection to Plaintiff's repeated accommodation requests for his physical disabilities. ECF No. 157-17 at 1.

Also troubling is evidence Plaintiff has put forward of Santos' statements on March 12, 2015 and April 14, 2015. On those dates, according to Plaintiff, Santos referred to Plaintiff's "physical conditions," and said that if Plaintiff got "any better" he could come back to work at the Bayamón branch when he was "fit for duty." ECF No. 157 at 48; 49, ¶ 75; ECF No. 157-17 at 1; ECF No. 157-19; ECF No. 157-23 at 21, ¶¶ 2–6; 22, ¶¶ 2–10. Such statements are clearly

connected to Plaintiff's alleged disabilities. The implication of Santos' statements is that Plaintiff had physical conditions that made him unfit to work at the Bayamón Branch.[27]

Plaintiff's burden at the prima facie stage of the <u>McDonnell Douglas</u> test is not onerous. <u>Brennan</u>, 150 F.3d at 26 (citing <u>Sánchez</u>, 37 F.3d at 719). Here, Plaintiff has identified multiple disparaging statements made over a period of seven months which have some connection to his alleged disabilities. What's worse, seven of these comments occurred on four separate dates in the space of a month—between March 12, 2015 and April 14, 2015. Plaintiff's showing is sufficient to meet the first step of the <u>McDonnell Douglas</u> test and creates a rebuttable presumption of discrimination.

### 3. Defendant's Legitimate, Non-Discriminatory Reasons

As with Plaintiff's ADEA claims, at step two of the <u>McDonnell Douglas</u> framework, after a plaintiff has succeeded in establishing a prima facie claim under the Rehabilitation Act, the employer must meet the burden of production in articulating a legitimate, nondiscriminatory reason for the challenged actions. <u>Bonefont Igaravidez</u>, 659 F.3d at 124 (citing <u>Dávila</u>, 498 F.3d at 16). If the employer fails to produce a legitimate, non-discriminatory reason for the challenged conduct, then the presumption of discrimination persists and summary judgment on those claims must be denied. <u>Mesnick</u>, 950 F.2d at 825.

Here, Defendant cites no reason as to why heavy packages exceeding Plaintiff's lifting limitations were not taken off of his route in 2015. Defendant therefore fails in its burden of production to articulate a legitimate, nondiscriminatory reason for failing to accommodate

---

[27] Plaintiff alleges that on several occasions Santos called him "slow." ECF No. 157-2 at 55, ¶¶ 1–12. Specifically, one incident occurred on March 20, 2015, when Santos yelled at one of the letter carriers to stay away from the Plaintiff, or Plaintiff "would take 4 hours to case his route." ECF No. 157-21 at 1; ECF No. 157-7 at 47, ¶¶ 11–22. Saying someone is "slow" does not necessarily mean the comment is aimed at a person's disability. An employee may be slow because they are easily distracted, tardy, or excessively thorough. However, a jury could also interpret this comment as circumstantial evidence that this comment and other statements were made in connection to Plaintiff's physical limitations.

Plaintiff's lifting impairments after February 20, 2015. Defendant also does not cite any evidence identifying a legitimate non-discriminatory reason regarding the incident on August 19, 2014 with Santos or why Santos or Lugo in March and April 2015 made statements calling Plaintiff a "cheater," "hustler," "repeat offender," "Trucoman56," or "slow," among other incidents previously detailed.[28] Considered in their totality, a reasonable jury could conclude that these statements were pervasive and severe enough to create an abusive working environment based on Plaintiff's disabilities which constitutes an adverse employment action.

When considered cumulatively, and with all inferences made in Plaintiff's favor, Plaintiff has created a dispute of material fact about whether he was subject to a hostile work environment based on his alleged disabilities and was wrongfully denied lifting accommodations. Because Defendant has failed to proffer any legitimate, non-discriminatory reason for any of the actions taken in connection to Plaintiff's disability "then the inference of discrimination created by the prima case persists, and the employer's attempt to secure summary judgment" must be denied. Mesnick, 950 F.2d at 825.

## C.  RETALIATION CLAIMS

Plaintiff also brings claims for retaliation under ADEA, the Rehabilitation Act, and the FMLA. ECF No. 28 at 22, 23, 24, 25, 28, 33.[29] Plaintiff alleges that he was subject to essentially

---

[28] Defendant argues that that Santos' comments about Plaintiff's slowness were not motivated by discrimination. Instead, Defendant alleges that Santos explained that Plaintiff' was often distracted at work, which "normally manifest in leaving his assignment to engage in lengthy conversations with fellow employees, playing with his cell phone and showing videos whenever his duties require him to leave his work area. These actions objectively contributed to Plaintiff being a slow worker". ECF No. 153 at 10–11. However, Defendant cites no record evidence for the above quotation such as a deposition or a written statement. Defendant therefore fails in its burden of production.

[29] In the complaint, Plaintiff also asserts a claim for retaliation in violation of Title VII of the Civil Rights Act of 1964 after he opposed an allegedly unlawful activity when he made complaints of age and disability discrimination, hostile work environment, and workplace harassment with the EEOC. ECF No. 28-1 at 24–25, ¶¶ 117–119. However, the first prong of a prima facie case of retaliation under Title VII requires that a plaintiff engaged in protected conduct under Title VII. Montañez v. Educational Technical College, 660 F. Supp. 2d 235, 243 (D.P.R. 2009) (citing Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir.2009)). Claims for age and disability discrimination are not protected classes under Title VII, and Plaintiff therefore cannot show that he engaged in

five categories of retaliation: (1) retaliatory harassment creating a hostile work environment; (2) retaliatory fabrication of false criminal charges; (3) retaliatory denial of reasonable accommodations; (4) retaliatory discipline for driving with an expired license; and (5) retaliatory discipline for FMLA protected absences. ECF No. 28 at 25, 27–28; 31–32

Plaintiff brings no direct evidence of retaliation. As discussed above, retaliation claims are also subject to the McDonnell Douglas burden shifting framework if a plaintiff lacks direct evidence of retaliatory animus. See e.g. González Rodríguez, 605 F. Supp. 2d at 370; Mesnick, 950 F.2d at 827. To assert a prima facie case of retaliation, a plaintiff must produce evidence that (1) he engaged in protected conduct under the applicable statute; (2) that he experienced an adverse employment action; and (3) that there existed a causal connection between the plaintiff's protected conduct and the alleged adverse employment action. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir.2013).

The burden to show a prima facie case is a "relatively low threshold" especially "where all inferences are drawn" in the nonmovant's favor. Hodgens, 144 F.3d at 165. Once a plaintiff makes the requisite prima facie showing, the employer must articulate a "legitimate, non-retaliatory" reason for the adverse employment action before the burden shifts back to the plaintiff to demonstrate under the entirety of the evidence that the offered reason is pretext cloaking the employer's retaliatory animus. Vázquez Robles v. CommoLoco, Inc., 186 F. Supp. 3d 138, 154–55 (D.P.R. 2016) (citing Kelley, 707 F.3d at 115).

---

protected conduct under Title VII. See supra note 3; Montañez, 660 F. Supp. 2d at 243 ("This claim was based on both age and disability—based discrimination, neither of which are protected classes under Title VII. Therefore, because Plaintiff is unable to meet the first requirement of her prima facie case, her claim of retaliation under Title VII fails.").

### 1.  The Prima Facie Cases of Retaliation

#### a.  Plaintiff's Protected Conduct

First, Defendant argues that because Plaintiff's initial contact with an EEOC advisor was on April 6, 2015, then any allegedly retaliatory acts that occurred before April 6, 2015 cannot constitute retaliation. ECF No. 153 at 20; ECF No. 152 at 9, ¶ 71. However, a plaintiff's protected conduct is not limited only to EEOC-activity, and each relevant statute protects certain conduct which can include informal complaints or requests. See e.g. Mesnick, 950 F.2d at 828 ("discussing a complaint of age discrimination that was made informally in a memorandum); Mercado Córdova, 369 F. Supp. 3d at 357–58 (discussing the protection of requests for reasonable accommodation and disability related benefits). Therefore, the first step in analyzing Plaintiff's prima facie claims is to examine what particular protected conduct Plaintiff exercised under each statute.

#### i.        ADEA Protected Conduct

Plaintiff engaged in ADEA protected conduct as of April 6, 2015. To establish the prima facie claim of retaliation under the ADEA, "[i]t is enough that the plaintiff had a reasonable, good-faith belief" that discrimination based on age occurred, that the plaintiff "acted on it," "that the employer knew of the plaintiff's conduct;" and "that the employer lashed out in consequence of it." Mesnick, 950 F.2d at 827.

Plaintiff asserts that he engaged in ADEA protected conduct as far back as August 2014 when he filed internal grievances about Santos. ECF No. 158 at 20; ECF No. 157 at 22, ¶ 71. On August 13, 2014, Plaintiff made an internal "Report of Hazard, Unsafe Condition or Practice" where he complained that Santos was "creating a hostile environment . . . His approach to every incident is with a very aggressive manner." ECF No. 157-25 at 1. Nevertheless, the internal

complaint makes no mention of age discrimination and so does not provide any evidence that Plaintiff had a good faith belief that he was subject to discrimination based on age. Plaintiff's internal report of a hazardous or unsafe condition therefore cannot be the basis of retaliation based on ADEA.

The first evidence cited in the record in which Plaintiff alludes to age-based discrimination or harassment is in his EEOC "Information for Pre-Complaint Counseling" on April 17, 2015. ECF No. 157-5 at 1. Before that, the parties agree that Plaintiff made initial contact regarding his EEOC claims on April 6, 2015. ECF No. 152 at 2, ¶ 9; ECF No. 152-6 at 1; ECF No. 157 at 3, ¶ 9. A reasonable inference can be made that Plaintiff also made an age-related claim in his initial contact with the EEOC Dispute Resolution Specialist on April 6, 2015. Therefore, Plaintiff did not engage in any ADEA protected conduct until April 6, 2015—at the earliest.

### ii.    Rehabilitation Act Protected Conduct

Plaintiff engaged in protected activity under the Rehabilitation Act much earlier and on many repeated occasions, beginning in April 2013. [30] For purposes of Rehabilitation Act retaliation, a plaintiff "requesting reasonable accommodation and/or disability-related benefits, such as leaves of absence, may constitute protected conduct under anti-retaliation provisions insofar as a retaliatory action by an employer may dissuade a reasonable worker from making such requests." Mercado Cordova, 369 F. Supp. 3d at 357–58 (citing Thompson v. North

---

[30] Like Plaintiff's ADEA retaliation claim, Plaintiff's August 2014 internal report "Report of Hazard, Unsafe Condition or Practice" against Santos makes no mention of disability, and so cannot be the basis of Rehabilitation Act protected conduct. See ECF No. 157-25 at 1. Plaintiff also argues that he "filed" a different internal grievance in August 2014 as well, where he complains of "constant threats, harassment, and intimidation, lack of respect and constant teasing and mocking from my supervisor Juan R. Santos. This all has to do with my health condition for which I have a case for which I am being treated by OWCP . . ." ECF No. 158 at 20. Plaintiff cited no evidence in the record of this complaint. It therefore cannot be properly considered for summary judgment. Even if it was, the language provided by Plaintiff only alludes to a "health condition" and gives no indication that this complaint is related to age. ECF No. 158 at 20.

American Stainless, LP, 562 U.S. 170, 173–75 (2011); Burlington N., 548 U.S. at 57. The plaintiff need not actually have a disability to exercise protected conduct. See Mesnick, 950 F.2d at 827.

Plaintiff requested and was given limited duties (accommodations), with regard to accidents he suffered in April 2013, September 2013, December 2013, June 2014, July 2014, and August 2015. ECF No. 152-1 at 99, ¶¶ 18–25; 100, ¶¶ 1–9; 104, ¶¶ 1–25; 105, ¶¶ 1–21; ECF No. 158 at 26; ECF No. 157-28 at 3–7. Plaintiff also made requests for auxiliary assistance in August 2014, and October 2014. ECF No. 152 at 5, ¶ 39; ECF No. 152-1 at 99, ¶¶ 18–25; 100, ¶¶ 1–9; 104, ¶¶ 1–25; 105, ¶¶ 1–21; ECF No. 157 at 30, ¶ 3A–4; ECF No. 157-6 at 2, ¶ 4–5. Plaintiff again made an OWCP claim in November 2014. ECF No. 1 at 181, ¶¶ 3–25; ECF No. 152-20 at 1; ECF No. 152-5 at 151, ¶¶ 1–14. Plaintiff filed another OWCP claim electing to be placed on a leave of absence after his accident on January 8, 2015. ECF No. 152 at 7, ¶ 58; ECF No. 157 at 17, ¶ 58; ECF No. 157 at 44, ¶ 52; ECF No. 157 at 79, ¶¶ 4–17. Finally, as with his ADEA claims, Plaintiff contacted the EEOC alleging disability discrimination on April 6, 2015, filed an "Information for Pre-Complaint Counseling" on April 17, 2015, and filed an EEOC Complaint on July 24, 2015. ECF No. 152-3; ECF No. 157-5.

### iii.    FMLA Protected Conduct

Under the FMLA, taking leave or activating leave are FMLA protected rights in a claim for retaliation in violation of the FMLA. See Carrero Ojeda v. Autoridad de Energia Eléctrica, 755 F.3d 711, 719 (1st Cir. 2014). The FMLA, inter alia, protects taking leave because of a "serious health condition that makes the employee unable to perform the functions of the position of such employee," or to care for a family member, such as a spouse, with a serious health condition. See 29 U.S.C.A. § 2612(1)(C)–(D).

Plaintiff's first FMLA protected activity occurred on January 8, 2015 when Plaintiff took 45-days of leave after he injured his knee on his route. Plaintiff also exercised FMLA leave on April 14, 2015 when Plaintiff was absent from work because, according to his EEOC Information for Pre-Complaint Counseling, he had to attend "a critical medical appointment with my wife that is in a critical stage of her pregnancy." ECF No. 157-5 at 3. In Plaintiff's July 24, 2015 EEOC complaint, Plaintiff also states that his absences from work on April 15, 16, and 28 were all related to his wife's pregnancy. ECF No. 152-3 at 010. Each of these absences in April 2015 would qualify as an FMLA protected leave of absence to care for a family member with a serious medical condition.

### b.  Whether the USPS Knew of Plaintiff's Protected Conduct

A plaintiff cannot be retaliated against for protected conduct unless the defendant knew about the plaintiff's protected conduct in the first place. Mesnick, 950 F.2d at 827. Defendant argues that Plaintiff fails to show that his supervisors were aware of his EEOC activity before they engaged in allegedly retaliatory acts. ECF No. 153 at 20. However, taking all inferences in favor of the Plaintiff, as discussed further below, a reasonable jury could find that supervisors Santos and Lugo knew about Plaintiff's EEOC activity and his other protected activity as well.

### i.      Plaintiff's Accommodation and Reports of Injuries

Plaintiff's supervisors would have known immediately about Plaintiff's requests for accommodations, auxiliary support, and his OWCP claims, because Plaintiff made them to his supervisors directly. For example, Plaintiff spoke directly to Santos in August 2014 about his accommodations, and Santos himself rejected Plaintiff's requests for limited duties in August and October 2014. Likewise, the evidence in the record shows that Lugo knew about Plaintiff's OWCP claim in November 2014 because he controverted Plaintiff's claim in December 2014.

45

Plaintiff has also produced evidence which shows that supervisors Santos and Lugo were aware of Plaintiff's January 8, 2015 OWCP request after Plaintiff suffered an accident. First, Plaintiff produced the deposition testimony of Moyeno who testified that the day of the accident, Santos told him that Plaintiff's CA-1 reporting the accident had been "drafted incorrectly." ECF No. 157 at 34, ¶ 14; ECF No. 157-8 at 76, ¶¶ 19-25; 77, ¶¶ 1–7. Additionally, after completing the CA-1 Moyeno testified that he delivered it to Lugo's desk in a folder labeled "for your eyes only, Richard Lugo" so that Lugo could enter the CA-1 "into the system." ECF No. 157-8 at 78, ¶¶ 1– 4, 8–14; 79, ¶ 1–3. Therefore, both Santos and Lugo were aware of the CA-1 reporting Plaintiff's fall on the very same day of the accident. Because Plaintiff's request for accommodation and OWCP reports were submitted to his supervisors, and because Plaintiff's supervisors acted directly in response to Plaintiff's requests and reports, it is clear that the USPS knew about this class of conduct protected by the Rehabilitation Act.

### ii.    Plaintiff's FMLA Protected Absences

Similarly, Plaintiff has produced evidence which, at the very least, produces a dispute of material fact that his supervisors knew about his FMLA protected conduct. As already discussed above, Santos and Lugo knew about Plaintiff's January 8, 2015 OWCP claim, and would have been aware of his subsequent 45-day absence. With regard to Plaintiff's FMLA protected absences on April 14, 15, 16, and 28, 2015, Plaintiff has created a dispute of material fact as to whether he notified his supervisors of his absences. Defendant asserts that Plaintiff failed to notify his supervisor or use the automated phone system at USPS to report his FMLA protected absences on April 14, 15, 16, and 28, 2015. ECF No. 152 at 11, ¶ 95; ECF No. 152-23 at 001. However, Plaintiff disputes this, claiming that he did make the proper notifications, and proffers evidence that after being disciplined he filed a grievance which showed that all of his absences in

April 2015 were "justified or permissible under the FMLA" and that he had provided proper notification for his absences. ECF No. 157-6 at 4, ¶ 11; ECF No. 157-16 at 2. Therefore, Plaintiff has raised a genuine dispute of material fact whereby a jury could find that the USPS was aware of each instance of Plaintiff's FMLA protected conduct on the day that it occurred.

### iii.    Plaintiff's EEOC Contact

Finally, Defendant argues that Plaintiff fails to show evidence that Santos and Lugo knew of Plaintiff's EEOC conduct, and thus could not have retaliated against Plaintiff for his EEOC activity. ECF No. 153 at 23. However, taking all inferences in favor of the Plaintiff, evidence in the record could lead a reasonable jury to conclude that Santos and Lugo were aware of Plaintiff's EEOC activity on or shortly after April 6, 2016. Plaintiff made initial contact with the EEOC on April 6, 2015 by requesting an appointment with an EEOC dispute resolution specialist. ECF No. 152 at 2, ¶ 9; ECF No. 152-6 at 1; ECF No. 157 at 3, ¶ 9; ECF No. 157-5 at 1. Eleven days later, on April 17, 2015, Plaintiff filed an "Information for Pre-Complaint Counseling" after his initial contact with the EEOC wherein Plaintiff alleged discrimination based on "physical disability" and "age" and requested a "proper limited duty agreement or a fair job accommodation." ECF No. 157-5 at 1, 5. Thereafter, on April 23, 2015, Plaintiff had his initial EEOC interview. ECF No. 157 at 2, ¶ 10; ECF No. 157 at 3, ¶ 10. On July 2, 2015 the EEOC issued Plaintiff a Notice of Right to File an Individual EEOC Complaint. ECF No. 152 at 2, ¶ 11; ECF No. 157 at 4, ¶ 11. Accordingly, on July 24, 2015, Plaintiff filed a formal EEOC complaint alleging discrimination based on age and disability, hostile work environment, retaliation, and violation of his FMLA rights. ECF No. 152 at 1, ¶ 4; 2, ¶ 12; ECF No. 157 at 5, ¶ 16; ECF No. 152-3 at 001, 005, 009, 010.

Santos and Lugo assert they did not know about Plaintiff's EEOC activity until June 2015. ECF No. 152 at 11, ¶ 99; ECF No. 152-7 at 7; ECF No. 152-4 at 004. Plaintiff, however, disputes this fact, stating in his unsworn declaration under penalty of perjury that he notified both Santos and Lugo of his "EEOC activity as soon as [he] filed" in an attempt to "have them stop their harassment and discrimination." ECF No. 158 at 22; ECF No. 157-7 at 7, ¶ 20. Plaintiff does not cite to evidence establishing with specificity <u>when</u> exactly he notified Santos and Lugo—whether April 6, April 17, April 23, or July 24, 2015.[31] Nevertheless, Plaintiff's assertion that he notified "each of them" "as soon as [he] filed" indicates a sequence of events which could lead a reasonable jury to conclude that he notified Santos and Lugo on or shortly after the date that he filed with the EEOC an Information for Pre-Complaint Counseling, that is April 17, 2015. Therefore, taking all reasonable inferences in favor of Plaintiff, a reasonable jury could conclude that Santos and Lugo knew that Plaintiff had contacted the EEOC on or about April 17, 2015.

### c.   Whether Plaintiff was Subjected to an Adverse Employment Action

Next, to succeed on a retaliation claim, a plaintiff must show that his employer subjected him to "some objectively and materially adverse action." <u>Bhatti v. Trustees of Boston Univ.</u>, 659 F.3d 64, 73 (1st Cir. 2011). To show an adverse employment action, plaintiff must present evidence that "a reasonable employee would have found the challenged action materially adverse," which means that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Colón Fontánez</u>, 660 F.3d at 36 (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)) (internal quotations omitted). Whether an

---

[31] Plaintiff's use of the phrase "EEOC activity" is ambiguous and could refer to his initial contact with an EEOC counselor, the filing of his Information for Pre-Complaint Counseling, his initial EEOC interview, or his filing of the EEOC complaint in July 2015. However, for the purposes of deciding summary judgment, the court makes every inference in Plaintiff's favor, thus concluding that he is referring to his first filing with the EEOC on April 17, 2015 of an "Information for Pre-Complaint Counseling."

action was materially adverse is examined on a case-by-case basis. Blackie v. Maine, 75 F.3d
716, 725 (1st Cir. 1996). Typically, the plaintiff must establish that his employer:

> either (1) [took] something of consequence from the employee, say, by
> discharging or demoting [him], reducing [his] salary, or divesting [him] of
> significant responsibilities, or (2) with[eld] from the employee an accouterment of
> the employment relationship, say, by failing to follow a customary practice of
> considering [him] for promotion after a particular period of service.

Shaffer v. IEP Tech., LLC, 2021 WL 3616072 (D. Mass. Aug. 16, 2021) (citing Blackie, 75 F.3d
at 725) (internal citations omitted). Here, Plaintiff shows that several acts by his supervisors
constituted adverse employment actions against him.

### i.      Refusal to Accommodate

Plaintiff made requests for accommodation that were denied on August 22, 2014 and
October 1, 2014 and made an OWCP claim in November 2014 which Lugo controverted on
December 3, 2014. Plaintiff also showed evidence that his lifting limitations were not respected
on his route in 2014 and 2015. ECF No. 157 at 32, ¶ 9; ECF No. 157-2 at 52, ¶¶ 17–24; ECF No.
157-2 at 53, ¶¶ 9–17. Plaintiff argues that by denying Plaintiff's requests for accommodations,
Plaintiff was retaliated against for protected conduct. ECF No. 158 at 21.

"[E]mployers are not required to provide a perfect accommodation or the very
accommodation most strongly preferred by the employee." Noll v. IBM Corp., 787 F.3d 89, 95
(2nd Cir. 2015). However, delaying an accommodation requested may very well dissuade a
disabled person from engaging in protected conduct. See Carmona Rivera v. Puerto Rico, 464
F.3d 14, 20 (1st Cir. 2006) ("[D]elay in providing the accommodations needed to meet a
disability may cause a significant injury or harm to a disabled person . . . ."). Even so, a plaintiff
must be able to show actual harm, rather than mere inconvenience. Id. Plaintiff has shown
evidence that prior to August 2014, Plaintiff had reached an arrangement with Lugo about his

accommodations, but Santos put an end to that arrangement, stating that Lugo could "stick that arrangement up his ass because he was the one that was there, and he was the one that would decide what was going to be done there." ECF No. 157 at 30, ¶ 3; ECF No. 157 at 40, ¶ 34; ECF No. 157-22 at 101, ¶¶ 2–16. Plaintiff testified in his deposition that as a result of his supervisors refusing to respect his lifting accommodations specifically, his "condition worsened." ECF No. 157-2 at 52, ¶¶ 17–24. Therefore, Plaintiff set forth that he suffered further physical harm because of the denial of accommodations. Plaintiff has produced enough evidence to show that being refused reasonable accommodations was a materially adverse employment action.

### ii.   Unjustified Discipline

Plaintiff also produces evidence showing that he was disciplined on several occasions by Santos. Discipline or a reprimand for the purposes of retaliation may constitute an adverse employment action if it was "undeserved" or "unfairly" imposed and if it carries "tangible consequences" which would dissuade a reasonable employee from making or supporting a charge of discrimination. Espinal v. National Grid NE Holdings 2, LLC, 794 F. Supp. 2d 285, 293 (D. Mass. 2011); Bhatti, 659 F.3d at 73; Billings v. Town of Grafton, 515 F.3d 39, 54–55 (1st Cir. 2008).

Here, Plaintiff has succeeded in showing evidence and creating a dispute of material fact that he was subject to an adverse employment action through unjustified discipline. First, on April 14, 2015 Santos suspended Plaintiff's driving privileges after discovering that Plaintiff had driven with an expired driver's license on April 13, 2015. ECF No. 152 at 11, ¶ 92; ¶ 93; ECF No. 152-21 at 00116; ECF No. 157 at 27, ¶ 93. On May 7, 2015, Plaintiff was also issued a Letter of Warning for failure to follow safety procedures for driving with an expired license. ECF No. 152 at 11, ¶ 94; ECF No. 157 at 27, ¶ 94. However, Plaintiff produced evidence that

Santos himself "insisted that [Plaintiff] take a postal vehicle despite [his] protestations." ECF No. 157-6 at 5. Therefore, Plaintiff has created an issue of material fact as to whether he was instructed to drive on an expired license and then subsequently disciplined for following orders—thereby making his later driving suspension unjustified. Furthermore, Santos suspending Plaintiff's driving privileges, if unjustified also tangibly changed the terms and conditions of Plaintiff's employment because he was no longer able to drive to complete his route.

Additionally, on April 14, 15, 16, and 28, 2015, Plaintiff was marked as being absent from work without prior approval because Plaintiff had allegedly failed to notify his supervisors of his absences. ECF No. 152 at 11, ¶ 95; ECF No. 152-23 at 001, 003–004. At least two of these absences were designated as Leave Without Pay. ECF No. 157-16 at 1. Subsequently, on May 14, 2015, Plaintiff was issued a seven-day suspension for failure to be in regular attendance. ECF No. 157-16 at 1. However, Plaintiff produced evidence which shows that the discipline for his absences was undeserved and unjustified. Plaintiff showed that on April 14, 15, 16, and 28 his absences were in connection with attending to his pregnant wife, and that he had notified his supervisors about the absences in accordance with FMLA procedures. ECF No. 157-6 at 4, ¶ 11; ECF No. 157-16 at 2. Making all inferences in Plaintiff's favor, if Plaintiff properly reported his absences, then the discipline he received was unjustified. Such disciplinary measures altered Plaintiff's conditions of employment. An employee who needs to attend to the health of his pregnant wife may very well decide not to report discrimination if he feels that it will result in being disciplined or suspended when he exercises FMLA protected absences. Therefore, a reasonable jury could find that the above acts of discipline (particularly those after April 17, 2015), if undeserved, would have dissuaded Plaintiff from making or supporting his claims of discrimination.

### iii.      Pressure to Transfer to Another Branch

On at least two occasions Santos suggested to Plaintiff or pressured Plaintiff to bid for a transfer to another post office branch. Standing alone, these acts by Santos are not an adverse employment action. "[A] *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 23 (1st Cir. 2002) (emphasis in original). Therefore, if Plaintiff's superiors had urged him to transfer to another branch, as long as his transfer did not amount to a demotion, such conduct is not adverse.

First, on March 12, 2015, Santos told Plaintiff that "you should go to work to another post office and when [you are] ready to work for real to bid back because at this post office you have to come to work." ECF No. 157 at 49, ¶ 75; ECF No. 157-17 at 1. Then, on April 14, 2015, Santos again told Plaintiff that "you might find something that you can do in some other station. And if you get any better, you can bid back to Bayamón branch when you are fit for duty." ECF No. 157 at 48, ¶ 71; ECF No. 157-19; ECF No. 157-23 at 21, ¶¶ 2–6; 22, ¶¶ 2–10.

In this case, Plaintiff was never transferred or forced to bid for another branch. Instead, making all inferences in favor of the Plaintiff, Santos at best suggested that Plaintiff bid for another branch and at worst pressured him to do so. Even so, Plaintiff was not transferred. Furthermore, no evidence cited in this case suggests Plaintiff was threatened with a transfer that would have resulted in a demotion in form or substance or caused any significant hardship to the Plaintiff. Nevertheless, the statements which Santos made, while not an adverse employment action in and of themselves, may provide additional cumulative evidence of a retaliatory hostile working environment, as further discussed below.

52

iv.      **Harassment & Hostile Work Environment**

Defendant principally argues that Plaintiff fails to show a prima facie case of retaliation by hostile work environment because the harassment to which Plaintiff claims he was subject did not rise to the level of a hostile work environment. ECF No. 153 at 19–23. The First Circuit explicitly recognizes that "workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of a prima facie case for Title VII retaliation cases." Noviello, 398 F.3d at 89. Because workplace harassment alone can constitute an adverse employment action for the purposes of a retaliation claim under Title VII, it follows that a hostile work environment constitutes adverse action in similar retaliation claims under the ADEA, Rehabilitation Act, and FMLA. It is therefore necessary to examine whether Plaintiff's alleged harassment was sufficiently "severe or pervasive" to create a retaliatory hostile work environment. Id.

Plaintiff showed he was subject to degrading statements by Lugo and Santos on several occasions, and a reasonable factfinder could conclude these statements created a retaliatory hostile work environment. As discussed previously, to be "severe and pervasive" for the purposes of a claim of hostile work environment, courts examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Marrero, 304 F.3d at 18–19; Arce, 818 F. Supp. 2d at 413. Acts that are less pervasive must be more extreme to meet the standard of severity. Rivera Rivera, 898 F.3d at 93; Arce, 818 F. Supp. 2d at 413 ("If actions do not meet the pervasive requirement, even incidents that seem severe will not satisfy the requirement."). For example, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the terms and conditions of employment to establish an objectively hostile or abusive work environment . . ." Rivera Rivera, 898 F.3d at 93 (citing Colón Fontánez, 660 F.3d at 44; Faragher, 524 U.S. at 788 (internal quotations omitted). Individual acts considered in isolation may not be "severe," and so a court must consider whether a factfinder could determine that the alleged conduct would "cumulatively" dissuade a reasonable employee from participating in protected conduct. Rodríguez Vives v. Puerto Rico Firefighters Corps of Puerto Rico, 743 F.3d 278, 285 (1st Cir. 2014). Allegations of dishonesty may contribute to a finding of severe treatment when considered cumulatively with other mistreatment, particularly if the allegations are made in the presence of a plaintiff's coworkers. Pérez v. Town of North Providence, 256 F. Supp. 3d 139, 153 (D.R.H. 2017) ("[T]he cumulative allegations include: placing an alleged harasser in charge of investigating Lt. Perez's injury; refusing to turn over examination results, in violation of the CBA; going on a public radio show and criticizing Lt. Perez for making the claims; and calling Lt. Perez a liar in front of her NPPD counterparts.").

On several occasions over a period spanning roughly seven months, Plaintiff was subjected to statements which cumulatively support a severity finding. The evidence shows that, on August 19, 2014, after Plaintiff requested auxiliary assistance and explained his previous arrangement with Lugo, Santos told the Plaintiff that Lugo could "stick" the arrangement "up his ass." ECF No. 157-22 at 101, ¶¶ 2–16. On December 3, 2014, Lugo also wrote that Plaintiff was a "repeated offender" when he controverted Plaintiff's November 24, 2014 OWCP request. ECF No. 152-20 at 1; ECF No. 152-5 at 151, ¶¶ 1–14. On March 12, 2015, after Plaintiff engaged in protected conduct related to his January 8, 2015 accident, Lugo told Plaintiff that he was "just a cheater like Robert Rosado (retired carrier) who had an accident on every route he was on." ECF No. 157 at 49, ¶ 75; ECF No. 157-17 at 1. Finally, after Plaintiff contacted the EEOC, Santos

and Lugo called Plaintiff a "repeat offender," a "hustler," and revealed they had a nickname for Plaintiff: "Trucoman56." ECF No. 157 at 32, ¶ 10; ECF No. 157-2 at 54, ¶¶ 13–22.

It is not to say that supervisors cannot challenge an employee's truthfulness on certain matters without it becoming harassment. However, the above statements and allegations were more than simple teasing and offhand comments. Calling Plaintiff a "repeat offender," "hustler," "Trucoman56," and "a cheater . . . who had an accident on every route . . ." implies or directly alleges that Plaintiff is dishonest, lies about his injuries or disabilities, and engages in fraud. Furthermore, several of these statements were made in the presence of Union Shop Steward Toledo—a fact which may have exposed Plaintiff to particular embarrassment. In short, the above statements were expressed in a spiteful, unprofessional, and provacative manner and are accusations of particularly severe misconduct.

There were additional components to this hostile working environment beyond the above severe disparaging remarks. Plaintiff brought evidence which shows that sometime after January 2015 he was subject to a "special procedure"—unusual according to at least one witness— whereby all disciplinary and injury matters for Plaintiff had to go through Santos. ECF No. 158 at 24; ECF No. 157 at 42, ¶ 46; 47, ¶ 68; ECF No. 157-8 at 68, ¶¶ 22–24; 134, ¶¶ 1–19. Plaintiff also showed, as discussed above, that Santos implied to Plaintiff that he was not "fit for duty" and that when he was "ready to work for real to bid back because at this post office you have to come to work." ECF No. 157 at 48, ¶ 71; ECF No. 157-19; ECF No. 157-23 at 21, ¶¶ 2–6; 22, ¶¶ 2–10. Such statements communicate that Santos believed that Plaintiff was not really working, was lazy, or otherwise not fit to work at the Bayamón branch. Again, while performance criticisms might be perfectly legitimate, taken in the light of the other comments made by Santos, these statements provide further evidence of the generally hostile environment Plaintiff

endured. Such acts and statements, standing alone may not create a hostile work environment, but they certainly contribute to an overall abusive environment.

Therefore, in totality, Plaintiff has produced evidence which shows he was repeatedly accused of dishonesty and fraud by being called a "repeat offender," "hustler," "Trucoman56," and "a cheater"; he was told that his accommodations arrangement could be stuck up Lugo's "ass"; he was forced into a special arrangement wherein his injuries and discipline was overseen by his most antagonistic supervisor; and he was told that he should leave the branch and not come back until he was ready to work "for real." Cumulatively taken, a reasonable factfinder could determine that Plaintiff was subject to retaliatory harassment and a hostile working environment which constitutes an adverse employment action.

### v.    The Fabricated Criminal Case

Plaintiff also asserts that he was subject to an adverse employment action when after he reported an accident on January 8, 2015 Santos and Lugo fabricated a criminal case against him. ECF No. 158 at 16, 17; ECF No. 157 at 25, ¶ 85; 33, ¶ 13. If true, such an action would clearly be substantial enough to dissuade an employee from engaging in any protected conduct. Surely an employee would think twice about engaging in any form of protected conduct if his supervisors would frame him for a crime in response. However, Defendant asserts that Plaintiff has failed to produce sufficient evidence to convince a reasonable jury that Santos and Lugo encouraged, pressured, or forced the Office of the Inspector General ("OIG") and the U.S. Attorney's Office to investigate and prosecute Plaintiff. ECF No. 152 at 10, ¶ 85. Defendant's argument is persuasive. Even indulging all reasonable inferences in Plaintiff's favor, Plaintiff's assertion that he was the target of a fabricated criminal case are based only on "conclusory

allegations, improbable inferences, and unsupported speculation" insufficient to survive summary judgment. See Medina Muñoz, 896 F.2d at 8.

The facts and allegations underlying Plaintiff's claim are as follows. On January 8, 2015 Plaintiff reported to Moyeno that he had fallen on his route. ECF No. 157 at 43. ¶ 47; ECF No. 157-8 at 71, ¶¶ 8–10; 75, ¶¶ 4–7. That same day, Moyeno saw Plaintiff's torn pants and swollen, red knee. ECF No. 157 at 43, ¶¶ 48; ECF No. 157-8 at 75, ¶¶ 8–20. Moyeno then gave the Plaintiff two forms: A Federal Worker's Compensation Form ("CA-17") and an Application of Continuation of Pay form ("CA-1"). ECF No. 157 at 43, ¶¶ 48; ECF No. 157-8 at 75, ¶¶ 8–20. Moyeno testified that he completed the CA-1 on the computer on January 8, 2015, but that Santos later came to him that day, looked at the CA-1 and told him that it had been "drafted incorrectly." ECF No. 157 at 34, ¶ 14; ECF No. 157-8 at 76, ¶¶ 19-25; 77, ¶¶ 1–7. Moyeno testified in his deposition, however, that he disagreed with Santos and that he had drafted the CA-1 correctly. ECF No. 157 at 34, ¶ 14; ECF No. 157-8 at 76, ¶¶ 19-25; 77, ¶¶ 1–7. Regardless, Moyeno completed the CA-1 and delivered it to Lugo's desk in a folder labeled "for your eyes only, Richard Lugo" so that Lugo could enter the CA-1 "into the system." ECF No. 157-8 at 78, ¶¶ 1–4, 8–14; 79, ¶ 1–3. Meanwhile, Plaintiff took the CA-17 with him to be completed by his physician. ECF No. 157 at 17, ¶ 59; ECF No. 152-1 at 109–10; ECF No. 152-11 at 38–39, ¶ 107.

On January 14, 2015, Lugo came to Moyeno and told him that there were some pages missing from Plaintiff's CA-1, and Lugo directed Moyeno to fill out the missing pages and put the then-current date of January 14, 2015 on the CA-1. ECF No. 157 at 44, ¶ 54; 46, ¶ 60; ECF No. 157-8 at 80, ¶¶ 8–25; 136, ¶¶ 1–7. Therefore, the original CA-1 was dated January 8, 2015 while the corrected CA-1 was dated January 14, 2015. ECF No. 157 at 44–45, ¶ 55; ECF No. 157-8 at 80, ¶¶ 20–25; 81, ¶ 1.

On February 27, 2015, after returning from his 45-day leave of absence, Plaintiff submitted the CA-17 which had been completed by his physician. ECF No. 157 at 17, ¶ 59; ECF No. 152-1 at 109–10; ECF No. 152-11 at 38–39, ¶ 107. Plaintiff asserts that when he returned to work and turned in his CA-17, he found that another CA-17 had already been submitted "for the same period of time." ECF No. 152-11 at 38, ¶ 107. Plaintiff alleges that he recognized the other CA-17 because it was a different CA-17 from a previous, unidentified occasion which had been returned to him. ECF No. 152-11 at 38–39, ¶ 107. Plaintiff admits that he did not see Santos make any alterations to the CA-17. ECF No. 157-2 at 57, ¶¶ 6–9. However, Plaintiff did testify at his deposition that at some unnamed time he saw Santos make three copies of a CA-17, and that the alterations that appeared in the CA-17 used in Plaintiff's criminal prosecution were the alterations he saw in the copies in Santos' hands. ECF No. 157-2 at 55, ¶¶ 22–25; 56; ¶¶ 24–25; 57, ¶¶ 1–4.

On October 28, 2015 a true bill was returned by a grand jury against Plaintiff alleging under Count One that Plaintiff "did willfully and knowingly make and use a false writing and document: that is a DOL OWCP CA-1 Form . . . by forging the official superior's signature and altering the dates in the receipt of notice of injury section of the CA-1 Form . . . ." ECF No. 152-24 at 4–5. Count Two alleged that "between on or about February 26, 2015 through on or about February 27, 2015" the Plaintiff "did willfully and knowingly make and use a false writing and document: that is a DOL OWCP CA-17 form . . . by altering the information in [the] Side B-physician section of the CA-17 Form . . . ." ECF No. 152-24 at 5. Counts three and four allege that Plaintiff falsified or made false statements on the CA-1 and CA-17 in order to receive compensation through the Office of Worker's Compensation Program. ECF No. 152-24 at 6–7.

Based on the above evidence, Plaintiff urges that"[t]he only legal conclusion is that, in fact, Santos copied the incomplete CA-17 and maliciously and with the intention to harm me as [an] employee processed and delivered . . ." the CA-17 and CA-1, which resulted in Plaintiff's prosecution. ECF No. 152-11 at 38–39, ¶ 107. Plaintiff's argument cannot prosper. As a threshold matter, the mere fact that a person is acquitted at a criminal trial does not necessarily mean that there was no probable cause to bring the criminal charges in the first place or that the target of the criminal prosecution was framed. Fleck v. Trustees of University of Pennsylvania, 995 F. Supp. 2d 390, 410 (E.D. Penn. 2014) ("Absence of probable cause . . . is not conclusively established by an adjudication of innocence in the prior proceeding."); Lovelien v. United States, 422 F. Supp. 3d 341, 353 n. 7 (D.D.C. 2019) ("[A]cquittal does not vitiate probable cause.").

### (1) The CA-1

Turning to the documents involved in the criminal case, Plaintiff appears to argue that (a) because Santos said the original CA-1 from January 8, 2015 was filed incorrectly, because pages from that CA-1 delivered to Lugo disappeared, and because Lugo then told Moyeno to fill out the missing pages on January 14, 2015, then a reasonable jury could find that Santos and Lugo engaged in a conspiracy to fabricate a criminal case against Plaintiff. ECF No. 157 at 45, ¶ 59; ECF No. 157-8 at 97, ¶¶ 2–7.[32] Even if Plaintiff's assertions are true, no reasonable jury could find that these facts are sufficient to show that Plaintiff was the victim of a fabricated criminal case.

Plaintiff cites to no evidence where Lugo or Santos told anyone that Plaintiff was the one who fraudulently wrote on portions of the CA-1 which were supposed to be filled out by

---

[32]Moyeno testified that Plaintiff was arrested "[b]ecause it so happened that forms [were] filled out [by Moyeno] and they [were] left at the office of [Lugo]. And then when [Santos] c[ame] and sa[id] that ['] this is filled out incorrectly,['] and [then] two or three days afterward the form disappears, and I have to do a new one." ECF No. 157 at 45, ¶ 59; ECF No. 157-8 at 97, ¶¶ 2–7.

Moyeno. At Plaintiff's criminal trial, Lugo stated that more than one supervisor could add information to an incomplete CA-1, and he openly testified that he had added missing information to Plaintiff's CA-1. ECF No. 157 at 34, ¶ 15; ECF No. 157-14 at 48, ¶¶ 10–25, 49, ¶¶ 1–5. Additionally, at Plaintiff's criminal trial, an expert forensic document examiner testified that part of the January 14, 2015 CA-1 was not written by Plaintiff. ECF No. 157 at 33, ¶ 13; ECF No. 157-15 at 46–51. When pressed by the court, Plaintiff's attorney at his criminal trial acknowledged that the forensic document examiner's testimony did not involve any portion of the document which Plaintiff was accused of falsifying. ECF No. 157-15 at 52, ¶¶ 20–24 (The Court: "Do you have any—is [the expert] going to testify that anything that has been testified that was written by Mr. González [Plaintiff] was not written by Mr. González?" M. González-Bothwell: "No, your honor." The Court: "Well then–"[and subsequently dismissing the expert]). Therefore, no evidence shows that Santos or Lugo alleged that Plaintiff had falsely made a portion of the document in question.

### (2) CA-17

Plaintiff's evidence with regard to the allegedly fabricated CA-17 is even more sparse than the CA-1. Plaintiff does not cite to any evidence to show that the USPS was responsible for fabricating any specific portion of the CA-17 which was attributed to him in the indictment. Plaintiff testified that he saw Santos making copies of a CA-17 with the alterations that appeared in his criminal trial. ECF No. 157-2 at 55, ¶¶ 22–25; 56; ¶¶ 24–25; 57, ¶¶ 1–4. Even taking this testimony as true, merely making copies of a document does not indicate that a person fabricated the contents of said document and then accused someone else of making them to implicate that person in a crime. Such a conclusion is based on improbable inferences and speculation. Furthermore, Plaintiff admits that he did not see Santos make any alteration to the CA-17 or that

either Santos or Lugo later attributed the alterations to Plaintiff. Without more, a reasonable jury could not use this evidence to find a USPS conspiracy to frame Plaintiff for fraud.

Nevertheless, as proof that Lugo and Santos falsely attributed the documents in question, Plaintiff proffers that Santos and Lugo failed to inform the OIG that Santos and Lugo had "changed and altered the documents upon which Plaintiff González was accused . . . ." ECF No. 157 at 25, ¶ 85. In support of this assertion, Plaintiff draws on his own deposition testimony where he alleges that,

> "[Santos] had the opportunity to clarify the issue with the CA-1 [and the two CA-17s] when he was interviewed [by the OIG agents investigating]. And manager Lugo had the opportunity to clarify the issue with the CA-1 that they altered. And that which [led to] my arrest . . . So if they [Lugo and Santos] didn't do it, it is because they had bad intentions toward me."

ECF No. 158 at 17; ECF No. 157-2 at 59, ¶¶ 17-24. However, Plaintiff has not cited to any evidence suggesting the source of his personal knowledge about what was said in any interview between Santos or Lugo and any OIG agents. Therefore, Plaintiff's allegations about what was said or not said during interviews between OIG agents and Santos and Lugo is speculative and cannot be proffered as evidence sufficient to defeat summary judgment. Such conclusory speculation does not show that Lugo and Santos fabricated and then falsely attributed any portion of said document to the Plaintiff. Thus, any claim based on the adverse employment action of fabricated criminal charges must be dismissed.

### d. Whether There Exists a Causal Connection Between Plaintiff's Protected Conduct and an Adverse Employment Action

To establish a prima facie claim for retaliation, a Plaintiff must demonstrate a causal connection between the protected conduct and the adverse employment action to which the employee was subject. Kelley, 707 F.3d at 115. Defendant argues that Plaintiff fails to show a

causal connection between his EEOC activity or any protected conduct under the statutes and any adverse employment action which he suffered from his supervisors. ECF No. 153 at 20, 22.

Like the general prima facie burden, the burden of showing a causal connection between the protected conduct and an adverse action at the prima facie stage is "quite easy to meet." Crevier v. Town Spencer, 600 F. Supp. 2d 242, 262 (D. Mass. 2008) (citing Hodgens, 144 F.3d at 165. In analyzing whether an exercise of protected conduct is causally connected to an adverse employment action, "[v]ery close temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection." Sánchez Rodríguez v. AT&T Mobility Puerto Rico, Inc., 673 F.3d 1, 15 (1st Cir. 2012) (citing Calero Cerezo, 335 F.3d at 25). A space of as long as a few months has been held to suggest causation. Sánchez Rodríguez, 673 F.3d at 15 ("Sánchez filed his EEOC complaint in February of 2007 and was disciplined in May of 2007. We believe this proximity is close enough to suggest causation, especially given the inferences we must draw in Sánchez's favor."). Whether Plaintiff has succeeded in showing a causal connection between his protected conduct and any adverse employment action will be addressed in turn, below.

### i. Plaintiff's Accommodation and Reports of Injuries

Plaintiff offers evidence that his requests for accommodation were rejected and his OWCP claims controverted in August, October, and December 2014, very shortly after he had requested accommodations or reported an injury in August, October, and November 2014. Plaintiff has presented evidence that he was subject to harassing comments by Santos and/or Lugo in August 2014, December 2014, March 2015, and April 2015—all within a period of days or, at most, less than a month after he engaged in protected Rehabilitation Act conduct in August 2014, October 2014, November 2014, and January 2015.

While harassing comments made in March or April likely do not show adequate temporal proximity to his denial or reasonable accommodations in August, October, or even November, other statements in the record provide circumstantial evidence of a causal connection. Particularly, a jury could conclude that Lugo's statement to Plaintiff in April that "[Y]ou're just a cheater . . . who had an accident on every route he was on" indicates that some of the harassing comments were in response to Plaintiff reporting injuries. ECF No. 157 at 49, ¶ 75; ECF No. 157-17 at 1. Lugo and Santos' statements in December and April that Plaintiff was a "repeat offender" also indicates that the statements were made because of Plaintiff's repeated reports of injuries and requests for accommodation.

Finally, Plaintiff's last request for accommodation in the record occurred in January 2015. Plaintiff was subject to unjustified discipline in April and May of the same year. First Circuit precedent suggests that those events are adequately close in time to indicate causation. Sánchez Rodríguez, 673 F.3d at 15. Additionally, other events occurring in April and May, such as the harassing statements mentioned above, provide further evidence that the disciplinary actions could have been related to Plaintiff's request for accommodation. As such, there is adequate evidence in the record which indicates that (1) certain harassing statements, (2) denial of Plaintiff's accommodations, and (3) acts of unjustified discipline had a causal connection to Plaintiff's reports of injuries and requests for accommodation.

### ii.    Plaintiff's FMLA Protected Absences

Turning to Plaintiff's FMLA protected absences, Plaintiff's first FMLA protected leave occurred in January 2015, when Plaintiff was on leave from the Bayamón Branch for 45 days. As above, the harassing statements to which Plaintiff was subject in April and May are adequately close in time to suggest causation, and other statements may indicate that Plaintiff's injury-

related leave in January provoked statements which led to a hostile working environment. In contrast, only a handful of harassing statements occurred in April 2015, after Plaintiff exercised FMLA protected absences on April 14, 15, 16, and 28, 2015.

However, an even stronger causal connection exists between Plaintiff's FMLA protected absences in April and the unjustified discipline levied on Plaintiff. On the very same days which Plaintiff took FMLA leave, Santos declared Plaintiff AWOL and put him on LWOP for two of the days. On April 14, 2015 Santos also suspended Plaintiff's driving privileges. Additionally, less than a month later, Santos issued Plaintiff a letter of warning on May 7, and suspended Plaintiff on May 12, 2015. These events, which happened mere days apart, are highly indicative of causation, and Plaintiff therefore succeeds in showing a causal connection between his FMLA absences and (1) certain harassing statements leading to a hostile work environment after Plaintiff's January 2015 leave of absence; (2) unjustified discipline for driving with an expired license; and (3) unjustified discipline for Plaintiff's legitimate FMLA absences in April 2015.

### iii.    Plaintiff's EEOC Contact

Plaintiff first made contact with an EEOC counselor on April 6, 2015. ECF No. 152 at 2, ¶ 9; ECF No. 152-6 at 1; ECF No. 157 at 3, ¶ 9. Shortly after his filing of an Information for Pre-Complaint Counseling on April 17, 2015, Plaintiff was the target of discipline on April 28 and May 14, 2015. Therefore, less than a month passed between Plaintiff's first EEOC filing and Plaintiff being disciplined. These acts of discipline were close enough temporally to suggest causation for purposes of Plaintiff's prima facie case. Sánchez Rodríguez, 673 F.3d at 15.

In sum, with regard to Plaintiff's prima facie claims of retaliation, Plaintiff has succeeded in (1) demonstrating that he engaged in protected conduct under the ADEA, Rehabilitation Act, and FMLA, (2) succeeded in demonstrating that he was subject to adverse employment actions,

and (3) succeeded in showing a causal connection between several instances of protected conduct and certain adverse employment actions. However, Plaintiff has failed to show he was subject to an adverse employment action in the form of a fabricated criminal case or a disadvantageous transfer to another branch. While any claims predicated only on those events must be dismissed, Plaintiff's remaining claims must proceed to step two of the McDonnell Douglas framework.

### 2. Defendant's Proffered, Non-Retaliatory Reasons

At step two, Defendant successfully articulates a non-retaliatory reason for two-out-of-three classes of adverse conduct to which Plaintiff was subject; namely, for refusing to accommodate and for disciplining Plaintiff. These reasons, on their face, are enough to satisfy Defendant's burden of production at step two of the McDonnell Douglas test. Bonefont Igaravidez, 659 F.3d at 124. However, Defendant fails to offer a legitimate, non-retaliatory reason for having created a hostile work environment in retaliation for Plaintiff's protected conduct. As already explained above with regard to Plaintiff's Rehabilitation Act claims, when a plaintiff has made out his prima facie case on a claim, but the defendant fails to provide a legitimate, non-retaliatory reason, then the inference of retaliation stands, and summary judgment must be denied with regard to that claim. Mesnick, 950 F.2d at 825.

### a. Retaliatory Refusal to Accommodate

First, Defendant alludes to a non-retaliatory reason why Santos denied Plaintiff's requests for auxiliary assistance on his route on August 22 and October 1, 2014. According to Santos in his EEOC Investigative Affidavit, auxiliary assistance is only provided when the volume of work on a route is high and needs adjustment. ECF No. 152 at 8, ¶ 67; ECF No. 152-4 at 012. Santos, however, could not remember if he "disapproved any requested assistance" and if he did, he

wrote that his "reasons would be noted" in the paperwork associated with the claim. ECF No.
152-4 at 012, ¶¶ 60–63. Moreover, not only does he not remember what course of action he took,
Santos also fails to unequivocally assert whether the denials of Plaintiff's requests for auxiliary
assistance on August 22 and October 1, 2014 were due to the requests not meeting the volume of
work requirements. However, even if Santos had provided a sufficient non-retaliatory reason, in
the end, as discussed further below, Plaintiff has proffered sufficient evidence to show pretext.

     With regard to Plaintiff's OWCP claim for November 24, Defendant argues that it was
Lugo's duty to controvert the 2014 OWCP claim because he believed it was unnecessary. ECF
No. 153 at 16. Lugo wrote in his December 3, 2014 letter to the Claims Examiner at the
Department of Labor that Plaintiff's claim was being controverted because,

> [t]he alleged accident occurred in his carrier case. There are no witnesses to the
> employee being injured. [The] Sack only weight was [sic] less than 2 pounds and
> pulling is even lighter. The employee has minimal leave and requested [a] day off
> after the incident. Although he was approved for 3 days, connecting annual leave
> with accident cop [sic]. The employee is a repeated offender.

ECF No. 152-20 at 2. Thus, the non-retaliatory reason articulated by Lugo for controverting
Plaintiff's OWCP claim is clear from the letter: He believed that Plaintiff was not telling the
truth about the accident, Plaintiff's reported injuries were not credible based on the weight of his
"sack," the Plaintiff was using the accident to secure time off, and Plaintiff had engaged in this
type of behavior previously. Such justification warrants a showing by Plaintiff of pretext.

     Defendant, however, offers no legitimate, non-retaliatory reason as to why overweight
packages were not taken off Plaintiff's route, nor does it deny the fact that in 2015, Plaintiff was
given packages that were heavier than he could lift. Therefore, with regard to any claim for
retaliation for failure to remove the heavy packages on Plaintiff's route, the presumption of
retaliation survives.

### b.   Discipline for Driving on an Expired License & FMLA Absences

Second, Defendant argues that Santos had legitimate reasons to discipline Plaintiff. Defendant urges that Santos legitimately suspended Plaintiff's driving privileges and issued a Letter of Warning because he found out that Plaintiff was driving with an expired license. ECF No. 153 at 21; ECF No. 152-21 at 00116; ECF No. 157 at 27, ¶ 93; ECF No. 157 at 27, ¶ 94. With regard to the discipline for Plaintiff's FMLA protected absences, Santos alleges that Plaintiff was placed on Leave Without Pay and declared AWOL in accordance with the Postal Labor Relations Manual because Plaintiff was absent from work on April 14, 15, 16, and 18, 2015 and failed to notify Santos of his absences. ECF No. 153 at 21; ECF No. 152-23 at 001, 003–004; ECF No. 152-23 at 001. These reasons meet Defendant's burden to articulate reasons which on their face justify a conclusion that the above disciplinary actions were taken for nonretaliatory reasons.

### c.   Hostile Work Environment Retaliation

Finally, with regard to Plaintiff's prima facie claim of retaliation through a hostile work environment, Defendant proffers no legitimate, non-retaliatory reason why Plaintiff's supervisors on multiple occasions called him a "repeat offender," "cheater," "hustler," and 'Trucoman56." Defendant also provides no legitimate, non-retaliatory reason why Santos told Plaintiff that his previous accommodation arrangements would be stuck up Lugo's "ass." To the extent that Defendant has denied that these statements were ever made, a controversy of material facts has arisen that must be submitted to a jury. However, should there be among these statements any that the Defendant has not denied, then Defendant has failed to articulate a non-retaliatory reason for the same, and thus the request for summary judgment regarding Plaintiff's claim for hostile work environment retaliation cannot prosper.

### 3.   Proof of Pretext

Once Defendant has asserted a legitimate, non-retaliatory reason for the adverse employment action, under the McDonnell Douglas framework, "the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation for the employee's opposition to a practice" challenged under the applicable statute. Mesnick, 950 F.2d at 827. There are "many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment . . . hurdle[]." Id. at 828. They include, for example, a showing that the plaintiff was subject to differential treatment in the workplace, temporal proximity between the protected activity and the adverse employment conduct, and "comments by the employer which intimate a retaliatory mindset." Id. Plaintiff succeeds in producing enough evidence which could convince a reasonable jury that Defendant's proffered reasons were pretext.

#### a.   Retaliatory Refusal to Accommodate

Plaintiff succeeds in producing evidence which could convince a reasonable jury that Defendant's reason for denying Plaintiff's request for accommodation was pretext. Plaintiff has produced evidence which tends to show that  with regard to his requests for reasonable accommodation he was treated differently than other USPS employees seeking accommodations. When Plaintiff asked for auxiliary support in August 2014, Santos demanded that Plaintiff bring medical evidence to support his request. ECF No. 152-8 at 1; ECF No. 157 at 30, ¶ 5; ECF No. 157-6 at 3–4, ¶ 9; ECF No. 157 at 37, ¶¶ 22; ECF No. 157-9 at 50, ¶¶ 7–12; 55, ¶¶ 20–25; 56, ¶¶ 1–10; 60, ¶¶ 9–15; ECF No. 157-10. Plaintiff asserts in his sworn declaration that he is not normally required to provide medical evidence to his supervisor to request auxiliary assistance. ECF No. 157-6 at 4, ¶ 9. Likewise, one witness to this incident, USPS employee Rolando

Franquiz, testified that in 27 years of working for the USPS he had never witnessed a supervisor demand medical documentary evidence from an employee except on this one occasion. ECF No. 157 at 37, ¶¶ 23; ECF No. 157-9 at 56, ¶¶ 20–25; 57, ¶¶ 1–6. This evidence indicates that other USPS employees requesting auxiliary support were treated differently than Plaintiff, and Plaintiff was required to produce evidence not normally required. A reasonable jury could conclude that this differential treatment evidences a retaliatory animus.

With regard to Lugo's decision to controvert Plaintiff's November 24, 2014 OWCP claim, Plaintiff cites to Lugo's use of the word "repeated offender" arguing that the word "clearly shows his discriminatory animus against Plaintiff González calling him a criminal term due to Lugo's perception that . . . he was committing some sort of crime . . . ." ECF No. 158 at 21. Taken in context of the entire letter, no reasonable jury could conclude that Lugo was accusing Plaintiff of a crime. Nevertheless, a reasonable jury could find that the term was a comment which intimates a retaliatory mindset. The term "repeat offender" suggests that Lugo was controverting this claim because Plaintiff had reported injuries in the past—valid or otherwise. Merely converting a claim because Plaintiff had previously filed injury claims could lead a reasonable jury to find a retaliatory motive behind Lugo's letter. Therefore, Plaintiff raises a genuine issue of material fact upon which a jury could find that Defendant's proffered reasons for denying Plaintiff's requests for accommodation were pretextual and that his requests were actually refused for retaliatory reasons.

### b.  Discipline for Driving on an Expired License & FMLA Absences

Turning to Santos' discipline of Plaintiff for driving with an expired license, Plaintiff argues that Santos' proffered reason for the discipline was a sham because as a matter of law Plaintiff's license was not expired. ECF No. 158 at 11; ECF No. 157 at 26, ¶ 91. He asserts that

"in an obvious set up, supervisor Santos insisted that Plaintiff take a postal vehicle despite [his] protestations. The incorrect letter of warning issued by Santos on May 7, 2015, was left without effect because of the then [ ] Law 2005 PR Ley 61, enacted, August 23, 2005 [9 L.P.R.A. § 5064]." ECF No. 157 at 26, ¶ 91; 27, ¶ 92; ECF No. 157-6 at 5, ¶ 12; ECF No. 158 at 11.

Plaintiff cites no Puerto Rico case law in support of his interpretation of the statute at issue. However, Section 5064 of Title 9 of the Laws of Puerto Rico, addressing the renewal of driver's licenses, provides "[a]ny person who holds a driver's license must renew it within thirty (30) days as of the expiration date . . ." 9 L.P.R.A. § 5064. The law does not state that the license is still valid and can be used during that 30-day period. Indeed, the term "expiration" means that the referenced document is no longer legally valid upon a pre-determined date. Expire, Black's Law Dictionary (11th ed. 2019) ("(Of an official document) to be no longer legally effective; to become null at a time fixed beforehand . . . ."). Furthermore, the 2005 amendment to the law, to which Plaintiff refers, provides that a proactive driver is allowed to renew his or her license as early as "sixty (60) days prior to its expiration date." 9 L.P.R.A. § 5064. Such a provision allows a driver to avoid ever driving with an expired license and suggests that the statute seeks to avoid drivers operating vehicles with expired licenses. Accordingly, Plaintiff is not correct that his license was still valid when he was disciplined because Plaintiff's license was indeed beyond the expiration date at the time he was driving. Thus, Santos' proffered reason for disciplining Plaintiff for driving with an expired license was legitimate, regardless of any alternate interpretation of 9 L.P.R.A. § 5064.

However, in Plaintiff's unsworn declaration under penalty of perjury he asserts that Santos "knew that my license was about to expire," by "reviewing my files at the manager's office" and then "insisted that [I] take a postal vehicle despite my protestations." ECF No. 157-6

at 5. This declaration creates an issue of material fact which could lead a jury to conclude that Santos had indeed retaliated against Plaintiff. Santos may have been legally justified to discipline Plaintiff for driving without a license, but if Santos had encouraged, insisted, or ordered Plaintiff to drive a postal vehicle knowing that he had an expired license and then disciplined him for doing so, a reasonable jury could find that Santos had orchestrated this discipline in retaliation for protected conduct that Plaintiff had exercised. Consequently, this claim must survive summary judgment.

Finally, regarding Santos' discipline of Plaintiff for his FMLA protected absences on April 14th, 15th, 16th, and 28th of 2015, Plaintiff proffers evidence that after being disciplined he filed a grievance which showed that all of Plaintiff's absences in April 2015 were "justified or permissible under the FMLA" and that he had provided proper notification for his absences. ECF No. 157-6 at 4, ¶ 11; ECF No. 157-16 at 2. Plaintiff also produced evidence which shows that Plaintiff was absent on April 14, 15, 16, and 28 to attend to his pregnant wife. ECF No. 157-5 at 3; ECF No. 152-3 at 010. This constitutes a classic dispute of material fact. Santos argues that his disciplinary actions were fully justified, while Plaintiff asserts that later events demonstrated that the discipline was not justified and that he notified his supervisors of his FMLA absences. Such a dispute must be resolved by a jury. Additionally, the close temporal proximity between Plaintiff's EEOC first filing on April 17, 2015, and the disciplinary measures taken against him after said date could lead a reasonable jury to conclude that Santos took advantage of Plaintiff's FMLA protected absences to retaliate against Plaintiff for EEOC activity. Such evidence is sufficient to create a dispute of material fact as to whether Defendant's proffered reason was pretext to cover retaliation. Therefore, a grant of summary judgment on Plaintiff's retaliation claim for unjustified discipline is inappropriate.

### D. FMLA INTERFERENCE CLAIM

Finally, Plaintiff also brings a claim for "interfering with, restraining, and denying the exercise of and the attempt to exercise" Plaintiff's Family Medical Leave Act rights. ECF No. 28 at 31, ¶ 152. In challenging Plaintiff's claim for interference with his substantive FMLA rights, Defendant only asserts that "a plaintiff can not [sic] allege jurisdiction over FMLA violations under [Title VII, the Rehabilitation Act, and the ADEA]" because those statutes provide "the exclusive remedy for federal employees alleging discrimination in the workplace." ECF No. 153 at 25.

However, the FMLA permits employees to bring claims under a separate cause of action under the FMLA itself. For example, as with other retaliation claims, an employee may bring a cause of action under retaliation and "must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." González Rodríguez, 605 F. Supp. 2d at 370. The FMLA also creates another cause of action called "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . ." Id. (citing 29 U.S.C. § 2615(a)(1)). "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." Id. (citing Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331 (1st Cir. 2005)). Consequently, Defendant's argument as to Plaintiff's FMLA interference claim is without merit. Therefore, Plaintiff's FMLA interference claim must also survive summary judgment and for the reasons discussed above, Plaintiff's retaliation claim under the FMLA must also survive summary judgment.

## V.      CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is hereby GRANTED IN PART AND DENIED IN PART. With regard to Plaintiff's age discrimination, and age-based hostile work environment claims under the ADEA, Defendant's motion for summary judgment is GRANTED. Additionally, Defendant's motion for summary judgment on Plaintiff's ADEA, Rehabilitation Act, and FMLA retaliation claims predicated on the fabrication of criminal charges is GRANTED. The Summary judgment motion is also GRANTED on all of Plaintiff's claims of discriminatory failure to accommodate in violation of the Rehabilitation Act based on acts which occurred before February 20, 2015. Accordingly, the above claims are DISMISSED WITH PREJUDICE.

However, Defendant's motion for summary judgment is DENIED with regard to Plaintiff's disability discrimination, hostile work environment, and remaining failure to accommodate claims under the Rehabilitation Act. Also, Defendant's motion for summary judgment is DENIED with regard to Plaintiff's retaliation claims under ADEA, the Rehabilitation Act, and FMLA for creating a hostile work environment, refusing to accommodate Plaintiff, and for levying unjustified discipline. Finally, Defendant's motion for summary judgment on Plaintiff's interference claim under the FMLA is DENIED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 24th day of March, 2022.

s/Marcos E. López
U.S. Magistrate Judge